**DENT–AIR, INC. and Raynard P. Nyberg, Respondents,**

**The Midway National Bank of St. Paul, Respondent,**

v.

**BEECH MOUNTAIN AIR SERVICE, INC. and Eugene G. Bradshaw, Appellants.**

**No. C1–82–738.**

Supreme Court of Minnesota.

April 22, 1983.

Nichols, Kruger, Starks & Carruthers and Daniel J. Starks, Minneapolis, for appellants.

Murnane, Conlin, White, Brandt & Hoffman and Lawrence R. King, St. Paul, for The Midway Nat. Bank of St. Paul.

Marshall G. Anderson, Minneapolis, for Dent-Air, Inc. and Raynard P. Nyberg.

WAHL, Justice.

This is an appeal from the denial of appellant's motion to dismiss for failure to join indispensable parties under Minn.R. Civ.P. 19.02 and for lack of personal jurisdiction. Because we conclude that Minnesota cannot constitutionally assert personal

jurisdiction over appellants, we do not reach the Rule 19 issue.

Respondents filed a three-count complaint in Hennepin County District Court for breach of separate lease agreements for three aircraft. Respondents are a Minnesota resident, Raynard P. Nyberg, Dent-Air, Inc., Nyberg's solely held corporation, and the Midway National Bank of St. Paul (Midway), the assignee of Nyberg's and Dent-Air's interests in the leases. Appellants are Eugene G. Bradshaw, a North Carolina resident, and his solely held corporation, Beech Mountain Air Service, Inc. (BMAS), the lessee under all three leases.

Nyberg formed the Dent-Air corporation to lease aircraft after he purchased a Cessna 404 Titan Ambassador, Serial No. N3942C ("Charlie"). He advertised the plane for lease in the national *Trade-A-Plane* magazine and began negotiations with a Florida company. When those negotiations fell through, someone responding to the ad suggested that he contact Eugene Bradshaw. Nyberg called Bradshaw, then traveled to North Carolina to negotiate a lease. The 2-year lease was executed on June 5, 1979 between Dent-Air and BMAS. It was made subject to Nyberg's "getting the bank financing for said airplane." The lease provided for acceptance of the Charlie at Minneapolis, but the plane was actually delivered to BMAS at Knoxville, Tennessee on June 8, 1979. On that day, Bradshaw signed a personal guarantee for the lease. He later sent numerous financial documents to Minnesota in order to help Nyberg obtain financing from Midway.

The Charlie was subleased by BMAS to Richard Wellons of Knoxville. Wellons then subleased the Charlie to Julio Martinez of Florida. The Charlie was stolen while subleased and has not yet been recovered.

Nyberg acquired a second Cessna, Serial No. N6247Q ("Quebec"), which he leased personally to BMAS on August 11, 1979. The parties disagree as to whether negotiations for this lease were initiated by Nyberg or by Bradshaw. The Quebec lease was not made subject to bank financing. Bradshaw personally guaranteed the Quebec lease.

The lease provided for acceptance of the Quebec at Rockford, Illinois, but the plane was delivered to BMAS in Tennessee.

The Quebec was also subleased to Wellons. The plane was damaged during landing while being piloted by an employee of Wellons. It was repaired in Tennessee, and Nyberg retook possession in Tennessee.

A third Cessna, Serial No. N8818G ("Gulf") was leased by Nyberg personally to BMAS on September 17, 1979. Again, the parties disagree as to who initiated the negotiations. It was leased under the same terms as the Quebec, and Bradshaw personally guaranteed the lease. The plane was financed by Midway. It was accepted in Atlanta, Georgia.

The Gulf was subleased by BMAS to Midway Aero Films, a Florida company. Nyberg executed a second lease on the Gulf on June 9, 1980. The lessee was FunTimes, Inc., a Florida corporation; Bradshaw signed FunTimes' lease as its agent and personally guaranteed the lease. It does not appear that FunTimes ever took possession of the Gulf. Instead, it was in the possession of Midway Aero Films when it was detained in Columbia, South America, by Columbian authorities. Efforts to recover the aircraft were unsuccessful.

In all three leases the lessee was to obtain and pay for insurance on the aircraft. Each lease contained a provision stating that the lease would be governed by Minnesota law. Also, in each lease a provision prohibiting subleasing was crossed out and initialed. All leases required redelivery of the aircraft to Minnesota, but none was redelivered. Rent was payable in Minnesota.

Both BMAS and Bradshaw, individually, contend on appeal that they do not have sufficient "minimum contacts" with Minnesota so as to permit a constitutional exercise of personal jurisdiction under Minnesota's long-arm statute, Minn.Stat. § 543.19 (1982).

Before a court can constitutionally exercise jurisdiction over a nonresident defendant, the plaintiff must make a prima

facie showing [1] that defendants have sufficient contacts with a state so that requiring them to defend in the state does not violate traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). It is "essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). Finally, in contract cases, the contract must have a substantial connection with the state. *See McGee v. International Life Insurance Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 201, 2 L.Ed.2d 223 (1957). The nonresident must be able to reasonably anticipate being haled into the state's court. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

In making this constitutional determination, we have adopted the five-factor test set out in *Aftanase v. Economy Baler Co.,* 343 F.2d 187, 197 (8th Cir.1965). *Vikse v. Flaby,* 316 N.W.2d 276, 282 (Minn.1982). An analysis of minimum contacts requires consideration of (1) the quantity of contacts, (2) the nature and quality of contacts, (3) the source and connection of those contacts to the cause of action, (4) the interest of the forum state, and (5) the convenience of the parties. The first three factors are the primary factors, with the last two deserving lesser consideration.

The alleged contacts [2] stretched over a period from June until September of 1979, during which time all three leases were negotiated and executed. During that time, financial papers were sent to Minnesota by Bradshaw. While the quantity of contacts cannot be termed systematic, this is not a case of one isolated lease arrangement. The series of three leases shows an intent to continue the business arrangement with respondents.

In reviewing the nature and quality of the contacts, we are attempting to ascertain whether the nonresidents "purposefully availed" themselves of the benefits and protections of Minnesota law. The impact in Minnesota of the transaction or tort is considered, but the foreseeability of an impact alone is not sufficient to confer personal jurisdiction. *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. at 295, 100 S.Ct. at 566. The relative standing of the parties is a more important consideration in determining whether the defendant was brought into contact incidentally through the unilateral activity of the plaintiff.

The parties argue over the importance of the "buyer-seller distinction" (here lessee-lessor). It is settled that only one due process standard, the requirement of "minimum contacts," applies to all defendants. *Northern States Pump & Supply Co. v. Baumann,* 311 Minn. 368, 371, 249 N.W.2d 182, 185 (1976). The cases have distinguished, however, between the quality of contacts of buyers and sellers. The distinction is based primarily on the traditional scenario in which the seller is the aggressor in the interstate relationship; the seller solicits customers, advertises, or otherwise initiates the dealings. *See* discussion in *Kreisler Manufacturing Corp. v. Homstad Goldsmith, Inc.,* 322 N.W.2d 567, 572–73 (Minn. 1982). Where the buyer is the aggressor, however, its buyer status will not protect it. In *Northern States Pump & Supply Co. v. Baumann,* 249 N.W.2d at 184, the nonresident defendant had come to Minnesota inquiring about leasing a well-drilling rig.

---

**1.** Once jurisdiction is challenged, the burden of proof is on the plaintiff, respondents here. Most of the contacts with Minnesota alleged by respondents are disputed by appellants. At the pretrial stage, however, the plaintiff's allegations and supporting evidence are to be taken as true. *Hardrives, Inc. v. City of LaCrosse, Wisconsin,* 307 Minn. 290, 293, 240 N.W.2d 814, 816 (1976).

**2.** While appellants attempt to separate the contacts of BMAS and Bradshaw, it is clear that Bradshaw personally guaranteed all three leases both as to payment and performance. Thus he was personally obligated for the insurance, the warranties, and the return of the aircraft to Minnesota.

He also negotiated and executed the contract in Minnesota, but, since physical presence is not determinative, *see Marquette National Bank of Minneapolis v. Norris,* 270 N.W.2d 290, 295 (Minn.1978), the defendant's aggressive behavior in soliciting a lease was the crucial factor in this court's decision that the exercise of *in personam* jurisdiction over the defendant was permissible.

Mere inquiry by a prospective buyer or seller, without more, will not sustain jurisdiction. For example, in *Fourth Northwestern National Bank of Minneapolis v. Hilson Industries, Inc.,* 264 Minn. 110, 117 N.W.2d 732 (1962) (hereinafter *Hilson* ), the buyer wrote from Kentucky to three Minnesota companies soliciting negotiations for purchase of ice machines. Thereafter, the seller did all the traveling to the buyer's state for negotiation and execution. The buyer conducted no sales campaign in Minnesota. It was the seller who took "the initiative in response to a nonresident corporation's inquiries." *Id.,* 264 Minn. at 117, 117 N.W.2d at 736. Similarly, in *Mountaire Feeds, Inc. v. Agro Impex, S.A.,* 677 F.2d 651, 652 (8th Cir.1982), the nonresident purchaser initially called the seller for price information, but it was not thereby considered the aggressor.

In the case at bar, the dominant party was the lessor. Nyberg and Dent-Air sought out Bradshaw. Nyberg made all the arrangements for the leases and traveled to North Carolina for their negotiation and execution. The requests by Bradshaw for subsequent leases were more closely akin to the "inquiries" made in *Hilson* than to any aggressive solicitation. Moreover, the inquiries did not initiate the parties' relationship as they did in *Baumann.*

The next qualitative contact is appellants' alleged knowledge of Midway's reliance on the leasing arrangements and on Bradshaw's financial statements in its decision to refinance the Charlie and the Gulf aircraft. Respondents claim that appellants have induced a financial transaction as was found sufficient to sustain jurisdiction in *Marquette National Bank of Minneapolis v. Norris,* 270 N.W.2d 290. In that case, Illinois residents negotiated a release of pledged securities owned by Minnesota residents in order to purchase those securities. The shares were pledged to a Minnesota bank, and the Illinois residents conducted all of the negotiations by mail and phone. The resultant transaction involved the execution of new promissory notes between the original debtors and the bank. The Illinois residents gave the debtors notes for the stock, with the stock as security, which were then assigned to the bank. This court held that the "crucial factor justifying the assumption of personal jurisdiction" was the fact that the nonresidents purposefully solicited the contacts and induced the financial transaction. *Id.,* 270 N.W.2d at 296. Without this aggressive initiation by the nonresident, financing by the resident party can be considered the unilateral activity of the resident, which is insufficient to confer jurisdiction. *Hanson v. Denckla,* 357 U.S. at 253, 78 S.Ct. at 1239.

Finally, respondents contend that the contract clause calling for application of Minnesota law is an important qualitative factor. We disagree. Had the parties wanted to ensure the use of Minnesota's courts in the event of breach of contract, they could have contractually consented to personal jurisdiction in Minnesota. A choice-of-law clause is not sufficient to confer jurisdiction, particularly where, as here, the clause was part of the lessor's standard lease form.

The third *Aftanase* factor, the relationship of contacts and the cause of action, requires little discussion here. The contacts involved in this case unquestionably gave rise to the cause of action and thus are properly connected to it.

As to the fourth factor, Minnesota does have an interest in providing a forum for its residents who have allegedly been wronged. *Northern States Pump & Supply Co. v. Baumann,* 249 N.W.2d at 186. This interest, however, is not a contact and cannot establish personal jurisdiction. In *Rush v. Savchuk,* 444 U.S. 320, 332, 100 S.Ct. 571,

579, 62 L.Ed.2d 516 (1980), rev'g 272 N.W.2d 888 (Minn.1978), where the state had an even greater interest in providing a forum for a resident who had suffered serious personal injury, the United States Supreme Court found minimum contacts lacking.

 The final factor listed by the court in *Aftanase* is the convenience of the parties. We have stated that whenever minimum contacts are present jurisdiction should be exercised unless the court finds that Minnesota jurisdiction is improper on *forum non conveniens* grounds. *Hardrives, Inc. v. City of LaCrosse, Wisconsin*, 240 N.W.2d at 820. We need not reach this consideration in the case at bar because we hold that minimum contacts sufficient to satisfy constitutional requirements for the exercise of personal jurisdiction are not present.

Respondent's complaint should be dismissed.

Reversed.