## In re MINNESOTA ASBESTOS LITIGATION.

### No. C1–95–223.

Court of Appeals of Minnesota.

Dec. 12, 1995.

Review Granted Feb. 9, 1996.

Harvey N. Jones, Michael R. Strom, Sieben, Polk, La Verdiere, Jones & Hawn, P.A., Hastings, James M. Hughes, Ness, Motley, Loadholt, Richardson & Poole, P.A., Charleston, SC, for Appellants.

David F. Herr, Cooper S. Ashley, Mark W. Lee, Maslon, Edelman, Borman & Brand, Minneapolis, for Respondents, CSR, Ltd.

Considered and decided by CRIPPEN, P.J., and KALITOWSKI and DAVIES, JJ.

## OPINION

DAVIES, Judge.

Appellants challenge the district court's dismissal of their asbestos-related claims for lack of personal jurisdiction. We reverse and remand.

## FACTS

Appellants are 187 plaintiffs who allege that they suffer from various diseases as a result of exposure to asbestos products that were manufactured by the Johns–Manville Corporation (Manville). Some of the asbestos used in the Manville products was mined by Australian Blue Asbestos, Pty., a subsidiary of respondent Colonial Sugar Refining Co, Ltd. (both CSR). CSR, an Australian company, sold the raw asbestos fiber to Manville. The issue on appeal is simply whether, under due process requirements, CSR has had sufficient minimum contacts with Minnesota to permit our courts to exercise personal jurisdiction over it in these suits. The district court dismissed all claims against CSR for lack of personal jurisdiction.

CSR has never had direct contact with Minnesota or its citizens.[1] Appellants argue, however, that CSR had a close business relationship with Manville, took advantage of and fostered Manville's business, and knew that Manville served a national market that included Minnesota. Appellants assert that this indirect contact is sufficient for the exercise of personal jurisdiction.

## A. CSR/Manville Business Relationship

The business relationship between CSR and Manville started in the 1930s. Between 1948 and 1962, CSR supplied 37,000 tons of raw "blue fiber" asbestos to Manville. The raw asbestos was shipped from Australia to ports on all three coasts of the United States and from there was sent to Manville plants across the country. After processing, the asbestos was used in Transite Pipe,[2] which was sold in Minnesota and throughout the United States. CSR told the Australian Tariff Board that a minimum of 25 percent of the asbestos used in Manville's Transite Pipe was of the "blue fiber" type sold by CSR.

## B. Fostering Manville's Business

CSR executives visited Manville's research and production facilities numerous times. The evidence suggests that these trips were related to CSR's interest in promoting use of its asbestos in Manville products. For instance, Manville's "liaison man" for the CSR visits testified that CSR's stated purpose

> was to find out how they could improve their fibers so we could use it in the products. I think their purpose was also to get information on what products we were

making that did use their fiber and blue fiber.

He also testified that, on one occasion, CSR employees spent two months in a Manville plant "learning the business." Deposition testimony indicates that discussions about how CSR asbestos was being used occurred "every time [CSR] came," which was about every year and a half to two years in the 1950s. In a document promoting its "blue fibre" asbestos, CSR stated that

> [w]ork done by C.S.R. to prove that blue fibre was satisfactory helped materially to bring about [a price increase] and augmented work by Johns–Manville.

## C. Knowledge of Manville's U.S. Marketing

The record contains substantial evidence that CSR knew of Manville's position as a leading manufacturer of building products that were marketed throughout the United States. In a presentation to the Australian Tariff Board, CSR stated that Manville was "one of the largest manufacturers of all types of asbestos cement products." Deposition testimony of a CSR executive indicates its awareness of Manville's "building materials empire." Further, CSR both advertised in and received *Asbestos,* a trade publication with international circulation. The May 1952 issue of the magazine contained an article on Manville's Transite Pipe, noting that it had been "[u]sed in the water systems of thousands of municipalities in every state in the union." In addition, as early as 1944, CSR reviewed Manville advertisements in *Sweets Architectural Catalog* and, at that time, re-

---

1. The district court summarized this lack of direct contact, stating that

   [CSR] is not licensed nor registered to do business and has no office or other place of business in the State of Minnesota or the United States. CSR has never been licensed to do business in Minnesota and has not conducted any business in this state. CSR has never shipped, sold or transported any goods to or in Minnesota. CSR does not maintain, and has never maintained, an office, telephone listing, bank account, P.O. box or mailing address in Minnesota. CSR does not have, nor has it ever had, any employees or agents based or residing in this state. CSR has never owned or leased or possessed any interest in real or personal property in Minnesota. CSR has never direct-

   ly derived any revenue from the sale of goods or services in Minnesota. It has never mined, manufactured, processed, imported, converted, compounded, retailed and/or directed to be sold raw asbestos or asbestos-containing products to or for anyone in Minnesota.

2. Appellants also assert that CSR asbestos was used in Sheet Packing, a product manufactured by Manville, and that some plaintiffs were exposed to asbestos through that product. CSR states that its asbestos was not used in Sheet Packing. This factual dispute has little relevance to our decision on the jurisdictional issue because it appears that the great majority of actions are based on exposure through Transite Pipe.

quested more brochures on Manville products.[3]

## ISSUE

Does CSR have sufficient minimum contacts with Minnesota to permit courts of our state to exercise personal jurisdiction over it for purposes of these asbestos-related claims?

## ANALYSIS

Appellants—relying on the stream of commerce theory—seek to establish personal jurisdiction over CSR under Minnesota's long-arm statute, Minn.Stat. § 543.19 (1994). Our supreme court has construed that statute to extend the jurisdiction of our courts as far as permissible under the due process limits of the federal Constitution. *Rostad v. On–Deck, Inc.*, 372 N.W.2d 717, 719 (Minn.1985), *cert. denied*, 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d 460 (1985). Due process requires that a defendant have

> certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). The requirement of "minimum contacts" has been interpreted to mean that "the defendant must have purposefully availed itself of the privilege of conducting activities within the jurisdiction." *Rostad*, 372 N.W.2d at 719 (citing *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958)).

Minnesota courts consider five factors in determining if the exercise of personal jurisdiction over a defendant meets the "minimum contacts" requirement:

(1) The quantity of contacts with the forum state,

(2) The nature and quality of contacts,

(3) The source and connection of the cause of action with these contacts,

(4) The interest of the state providing a forum,

(5) The convenience of the parties.

*Id.* at 719–20. (quoting *Vikse v. Flaby*, 316 N.W.2d 276, 282 (Minn.1982)). The first three factors are given more weight in the final determination. *Id.* (citing *Dent–Air, Inc. v. Beech Mountain Air Serv.*, 332 N.W.2d 904, 907 (Minn.1983)). The plaintiff bears the burden of establishing jurisdiction by making "a prima facie showing of minimum contacts through its complaint and supporting evidence, 'which will be taken as true.'" *Johnson Bros. v. Arrowhead Co.*, 459 N.W.2d 160, 163 (Minn.App.1990) (quoting *Hardrives, Inc. v. City of LaCrosse, Wis.*, 307 Minn. 290, 293, 240 N.W.2d 814, 816 (Minn.1976)).[4]

### A. Quantity of Contacts

Appellants rely on the "stream of commerce" theory in asserting that the indirect contacts between CSR and Minnesota are sufficient to permit our exercise of personal

---

3. A copy in the record of one Manville brochure for Transite Pipe states that the product has been "[s]old over and over again in all 48 states," and lists Manville sales offices throughout the country, including Minneapolis and St. Paul. There is, however, no direct evidence that CSR reviewed this particular brochure.

4. CSR's first defense against jurisdiction is to attack some of the evidence submitted by appellants as "unauthenticated documents," which were attached "to an affidavit of an attorney who claims to have considerable experience in asbestos cases." CSR asserts that this evidence should not have been considered by the district court and that it is insufficient to meet appellants' burden of making a prima facie case for jurisdiction.

Although CSR made this argument in its memorandum to the district court, it does not appear that there was a motion in the district court to strike the evidence from the record, and the district court's order fails to rule on or even discuss the issue. Therefore, the issue is not properly before us. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988) (generally, appellate courts do not address issues not presented to and decided by trial court). Also, CSR did not file a notice of review of the issue. *See* Minn. R.Civ.App.P. 106 ("[a] respondent may obtain review of a judgment or order entered in the same action which may adversely affect him by filing a notice of review with the clerk of the appellate courts").

jurisdiction. Our supreme court has unequivocally adopted the use of this theory:

> Hence, if the sale of a product of a manufacturer * * * is not simply an isolated occurrence, but arises from the efforts of the manufacturer * * * to serve **directly or indirectly,** the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum **State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State.**

*Rostad,* 372 N.W.2d at 720 (quoting *World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 297–98, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980) (emphasis added by *Rostad* court)).

In *Rostad,* the plaintiff was injured in Minnesota by a weight that flew off a softball bat. *Id.* at 718. The weight was manufactured by On–Deck, a New Jersey corporation. *Id.* The only obvious "contact" On–Deck had with Minnesota was that distributors sold its product in this state. *Id.* at 718–19.

Our supreme court held that the exercise of personal jurisdiction over On–Deck was proper, rejecting On–Deck's claim that "purposeful contacts" under *World–Wide Volkswagen* requires direct contact. *Id.* at 720. The court pointed to several indirect contacts between On–Deck and Minnesota that supported the exercise of jurisdiction with respect to the "quantity of contacts" factor: (1) On–Deck "entered into contracts with others to distribute its products throughout North America, * * * a market which specifically includes Minnesota"; (2) On–Deck's executives traveled "the United States extensively marketing their product"; (3) On–Deck made "calculated attempts," through its distribution and marketing, to create a national market that included Minnesota; (4) On–Deck's distributors were very successful in marketing the product in Minnesota and On–Deck profited as a result; and (5) the product was in Minnesota

> not by some fortuitous happenstance of a plaintiff bringing the product to the jurisdiction as in *World–Wide Volkswagen,* but by the purposeful marketing efforts of On–Deck and [its] distributors.

*Id.* at 721.

We find CSR's indirect contacts to be similar to those in *Rostad,* with Manville acting essentially as a distributor for CSR's asbestos. Further, the asbestos is inherently dangerous, rather than being made so by Manville's processing of it. There appears to be little dispute that Manville products containing CSR asbestos were distributed throughout the United States, including Minnesota. CSR undoubtedly profited by Manville's extensive market. CSR's claim that it had no involvement beyond selling the asbestos in Australia is refuted by the evidence of its significant working relationship with Manville. CSR employees regularly traveled to Manville's facilities in the United States, and the employees' function went well beyond concluding sales agreements. Their goal was to learn how the CSR product was being used and how it could be improved to increase its use. On at least one occasion, CSR employees stayed two months at a Manville research and production facility. This activity is the equivalent of the marketing in *Rostad,* as it was intended to increase demand—including Minnesota demand—for CSR's asbestos and thereby to increase profits.

Our holding in *Stanek v. A.P.I., Inc.,* 474 N.W.2d 829 (Minn.App.1991), *review denied* (Minn. Oct. 31, 1991), *and cert. denied,* 503 U.S. 977, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992), also supports use of the stream of commerce theory to find a sufficient quantity of contacts between CSR and Minnesota. In *Stanek,* the defendant, LAQ, was an asbestos mining company incorporated in Delaware, with its principal place of business in Quebec, Canada. *Id.* at 831. In finding Minnesota jurisdiction over LAQ to be proper, the court explicitly recognized the stream of commerce theory from *Rostad* and stated that:

> LAQ was selling asbestos to companies (large U.S. corporations). This leads to the natural inference that the asbestos fiber was to be put into the nationwide stream of commerce through the marketing of one or more of those major corpora-

tions. It is also reasonable to infer that the asbestos reached Minnesota, a major manufacturing and industrial center of the upper Midwest.

*Id.* at 833. The same inference may be drawn from the facts in the present case.

CSR notes that in *Stanek* this court went on to consider additional direct contact between LAQ and Minnesota. *Id.* at 834. Indeed, there were some direct sales in Minnesota, as well as visits to and solicitation of Minnesota companies. *Id.* CSR argues that the holding in *Stanek* is based both on the indirect contacts and these direct ones. But the *Stanek* court distinguished two other cases cited with respect to the "quantity of contacts" factor and relied on LAQ's indirect contacts, thus suggesting that the indirect contacts were the primary basis for its finding of jurisdiction. *Id.*

CSR also argues that the Supreme Court limited the stream of commerce theory in *Asahi Metal Indus. v. Superior Court of Calif.*, 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987). CSR suggests *Asahi* requires "something more" than the act of placing the product in the stream of commerce before due process would be satisfied.[5]

In this case, though, CSR *did* do "something more"—CSR made calculated efforts to increase the usefulness of its asbestos to Manville, so that Manville would use it in greater quantity in products for its well-known national market and bring increased profit to both companies.

**5.** We note, although we do not rely on it, that in *Stanek*, our supreme court expressly held that only four justices in *Asahi* would have required this "something more" and thus the stream of commerce theory from *Rostad* had not been so limited. *Stanek*, 474 N.W.2d at 833–34.

**6.** With respect to its argument about the importance of the F.O.B. Australia shipping term, CSR cites *Gould v. P.T. Krakatau Steel*, 957 F.2d 573 (8th Cir.1992), *Papachristou v. Turbines, Inc.*, 884 F.2d 1116 (8th Cir.1989), *vacated*, 892 F.2d 1327 (8th Cir.1989), and *Aaron Ferer & Sons v. American Compressed Steel*, 564 F.2d 1206 (8th Cir.1977). But *Gould*, apart from mentioning it in the fact section of the opinion, does not even discuss shipping terms. 957 F.2d at 575. *Papachristou*, which in any event has been vacated,

CSR further argues that because all of its asbestos was shipped "FOB Australia," it never delivered any goods to the United States and cannot be subject to personal jurisdiction in Minnesota. We have noted that Minnesota may exercise jurisdiction even when risk of loss on the product passes elsewhere. *Hanson v. John Blue, Co., Div. of Burnley Corp.*, 389 N.W.2d 523, 526 (Minn. App.1986), *review denied* (Minn. Aug. 13, 1986). A defendant may not avoid the exercise of jurisdiction by "using an intermediary or by professing ignorance of the ultimate destination of its products." *Id.* (quoting *DeJames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 285 (3d Cir.1981), *cert. denied*, 454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981)), *quoted in Rostad*, 372 N.W.2d at 721. CSR discusses several Eighth Circuit decisions, but at best these cases consider the shipping terms or "place of performance" as but one consideration in conducting the "minimum contacts" analysis.[6]

**B. Nature and Quality of Contacts**

When considering this factor, we must determine whether the defendant " 'purposefully availed' [itself] of the benefits and protections of Minnesota law." *Dent–Air, Inc.*, 332 N.W.2d at 907. The defendant must be able reasonably to anticipate being haled into court in the forum state. *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. at 567; *Johnson Bros.*, 459 N.W.2d at 164. This factor, like the first, may be established through the stream of commerce theory. *Stanek*, 474 N.W.2d at 834.

discusses "place of performance," but goes on to note that when performance is to occur in the forum where jurisdiction is sought, it is still a "secondary or ancillary factor and cannot alone provide the 'minimum contacts' required by due process." 884 F.2d at 1119–20 (quoting *Scullin Steel Co. v. National Ry. Utilization Corp.*, 676 F.2d 309, 314 (8th Cir.1982)). Thus, *Papachristou* appears to cut against, rather than for, CSR's argument about the importance of the shipping terms. (We note that the dissent would have given more weight to the place of performance. *Id.* at 1120.) *Aaron Ferer* does not discuss the issue, but simply mentions the place of performance or execution of a contract as one factor in determining whether the "minimum contacts" requirement is satisfied. 564 F.2d at 1210.

In *Rostad,* our supreme court found that the nature of the defendant's contact with Minnesota arose from the sales of its bat weights. 372 N.W.2d at 722. In *Stanek,* we similarly found that the nature of the contact arose out of the asbestos company's profits "from the widespread sale of asbestos." 474 N.W.2d at 834. Although it was impossible to determine which of its sales eventually touched our state, we noted that the defendant's

> extensive sales to large American distributors suggest contacts sufficient in nature and quality so that a reasonable inference may be drawn from the character of the business.

*Id.* at 834–35.

Evaluation of this factor goes hand-in-hand with the evaluation of the quantity of contacts. Appellants have advanced substantial evidence demonstrating CSR's efforts to promote its business through Manville. As it clearly profited thereby, CSR's contacts sufficiently demonstrate that it "purposefully availed" itself of the privileges and benefits of the Minnesota market and law, and it should reasonably have anticipated being haled into court here for any injury caused by its asbestos.

## C. Source and Connection of the Cause of Action with the Contacts

Appellants allege that CSR's contact with Minnesota was through its knowing and active promotion of Manville's expanding use of CSR asbestos in products sold nationwide, including in Minnesota. The suits here allege injury caused by exposure to asbestos contained in those products. CSR's contact with Minnesota is directly connected to the causes of action in this case and therefore this factor weighs in favor of the exercise of jurisdiction.

## D. Interest of Minnesota in Providing a Forum

As we stated in *Stanek,*
> [w]e are confronted with the cases of Minnesota workers who allege they have been afflicted with terrible diseases as a result of exposure to asbestos. Minnesota has a strong interest in providing a forum

for their cases. Indeed, it is inscribed in our constitution:
> Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws.

474 N.W.2d at 835 (quoting Minn. Const. art. I, § 8). This state has an interest in providing a forum for appellants.

We also note that a great deal of asbestos litigation against CSR is being pursued across the nation. Our exercise of jurisdiction will provide our state's citizens access to funds from which potential settlements or judgments in those actions would be paid, helping to avoid depletion of those assets by plaintiffs in other jurisdictions. Further, there is no suggestion that CSR has closer contacts with those other states than it has with Minnesota.

## E. Convenience of the Parties

We have concluded that minimum contacts exist between CSR and Minnesota.
> When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant.

*Asahi,* 480 U.S. at 114, 107 S.Ct. at 1033.

It is clear that Minnesota is a more convenient forum for appellants, since most of them reside and allege exposure in this state. Any inconvenience to CSR is outweighed by the interests of these appellants and our state in having the claims litigated here.

## DECISION

The facts present sufficient minimum contacts to satisfy the due process requirements for exercising jurisdiction over CSR. The district court erred in dismissing appellants' claims for lack of jurisdiction.

**Reversed and remanded.**