MCKEIG, Justice.
Appellant Ford Motor Company (Ford) appeals from a court of appeals decision affirming a district court's exercise of specific personal jurisdiction over Ford in a products liability case. Central to the litigation is a Ford vehicle that was involved in a car crash in which the passenger was seriously injured and an airbag in the vehicle allegedly failed to deploy. Ford argues that its contacts with Minnesota were not sufficiently connected to the current litigation because the car at issue was designed, manufactured, and sold outside of Minnesota. Because the claims here arise out of or relate to Ford's contacts with Minnesota, we affirm the court of appeals.
*748 FACTS
In January of 2015, Respondent Adam Bandemer, a Minnesota resident, was a passenger in a 1994 Ford Crown Victoria driven on a Minnesota road by defendant Eric Hanson, a Minnesota resident. Hanson rear-ended a Minnesota county snow plow, and the car ended up in a ditch. Minnesota county law enforcement responded to the crash, and Bandemer alleges that he suffered a severe brain injury as a result of the passenger-side airbag not deploying. He was treated for his injuries by Minnesota doctors in Minnesota. Bandemer alleges that the airbag failed to deploy because of a defect, and that the accident was caused by Hanson's negligence. He filed a complaint in district court alleging products liability, negligence, and breach of warranty claims against Ford and negligence claims against Hanson and his father, who owned the car.
Ford moved to dismiss Bandemer's claims for lack of personal jurisdiction. See Minn. R. Civ. P. 12.02(b). Ford does not dispute the quantity and quality of its contacts with Minnesota, nor does it dispute the reasonableness of personal jurisdiction under the circumstances. But it argues that, because the Ford car involved in the accident was not designed, manufactured, or originally sold in Minnesota, Ford cannot be subject to personal jurisdiction in Minnesota on this claim.
Ford's contacts include sales of more than 2,000 1994 Crown Victoria cars-and, more recently, about 200,000 vehicles of all kinds in 2013, 2014, and 2015-to dealerships in Minnesota. Ford's advertising contacts include direct mail advertisements to Minnesotans and national advertising campaigns that reach the Minnesota market. Ford's marketing contacts include a 2016 "Ford Experience Tour" in Minnesota, a 1966 Ford Mustang built as a model car for the Minnesota Vikings, a "Ford Driving Skills for Life Free National Teen Driver Training Camp" in Minnesota, and sponsorship of multiple athletic events in Minnesota. Ford also collects data from its dealerships in Minnesota for use in redesigns and repairs. Finally, Ford has employees, certified mechanics, franchises, and real property, as well as an agent for accepting service, in Minnesota.[1]
The district court held that the exercise of jurisdiction over Ford was proper, and Ford appealed. The court of appeals, applying our decision in Rilley v. MoneyMutual, LLC , 884 N.W.2d 321 (Minn. 2016), cert. denied , --- U.S. ----, 137 S. Ct. 1331, 197 L.Ed.2d 518 (2017), held that the district court did not err in denying Ford's motion to dismiss for lack of personal jurisdiction because Ford's marketing contacts with Minnesota "established a 'substantial connection between the defendant, the forum, and the litigation, such that [it] purposefully availed [itself] of the forum' " and those contacts "sufficiently relate[ ] to the cause of action ...."
*749 Bandemer v. Ford Motor Co. , 913 N.W.2d 710, 715 (Minn. App. 2018) (quoting Rilley , 884 N.W.2d at 332 ). The court of appeals rejected Ford's arguments that the Supreme Court's decisions in Walden v. Fiore , 571 U.S. 277, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014), and Bristol-Myers Squibb Co. v. Superior Court of California , --- U.S. ----, 137 S. Ct. 1773, 198 L.Ed.2d 395 (2017), require a more direct connection between and among the defendant, the forum, and the litigation than the standard articulated by this court in Rilley . 913 N.W.2d at 715-16. This appeal followed.
ANALYSIS
"Whether personal jurisdiction exists is a question of law, which we review de novo." Rilley , 884 N.W.2d at 326 (citation omitted) (internal quotation marks omitted). After a defendant challenges a court's exercise of personal jurisdiction, the plaintiff must make a prima facie showing that personal jurisdiction is proper. Juelich v. Yamazaki Mazak Optonics Corp. , 682 N.W.2d 565, 569-70 (Minn. 2004). When reviewing a motion to dismiss for lack of personal jurisdiction, we accept all of the factual allegations in the complaint and supporting affidavits as true. Rilley , 884 N.W.2d at 326. In a close case, we resolve any doubt in favor of retaining jurisdiction. Hardrives, Inc. v. City of LaCrosse , 307 Minn. 290, 240 N.W.2d 814, 818 (1976).
Minnesota's long-arm statute prevents personal jurisdiction over a nonresident defendant if it would "violate fairness and substantial justice." Minn. Stat. § 543.19, subd. 1(4)(ii) (2018). We may "simply apply the federal case law" because Minnesota's long-arm statute "extend[s] the personal jurisdiction of Minnesota courts as far as the Due Process Clause of the federal constitution allows." Valspar Corp. v. Lukken Color Corp. , 495 N.W.2d 408, 410-11 (Minn. 1992). The Due Process Clause of the Fourteenth Amendment limits the ability of a state to exercise its coercive power by asserting jurisdiction over non-resident defendants. Bristol-Myers Squibb Co. , --- U.S. ----, 137 S. Ct. at 1779. A state may not exercise personal jurisdiction unless the defendant has "minimum contacts" with the state and maintaining the lawsuit "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington , 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted) (internal quotation marks omitted).
We analyze five factors to determine whether the exercise of personal jurisdiction is consistent with federal due process: " '(1) the quantity of contacts with the forum state; (2) the nature and quality of those contacts; (3) the connection of the cause of action with these contacts; (4) the interest of the state providing a forum; and (5) the convenience of the parties.' " Rilley , 884 N.W.2d at 328 (quoting Juelich , 682 N.W.2d at 570 ). This five-factor test is a means for evaluating the same key principles of personal jurisdiction established by the Supreme Court-reasonableness in light of traditional notions of fair play and substantial justice. See K-V Pharm. Co. v. J. Uriach & CIA, S.A. , 648 F.3d 588, 592 (8th Cir. 2011) ; Dent-Air, Inc. v. Beech Mountain Air Serv., Inc. , 332 N.W.2d 904, 907 (Minn. 1983). The first three factors determine whether Ford has sufficient "minimum contacts" with Minnesota, and the last two factors determine whether jurisdiction is otherwise "reasonable" under concepts of "fair play and substantial justice." Juelich , 682 N.W.2d at 570.
I.
We will first address factors one through three, which determine whether minimum contacts are present. A defendant has sufficient "minimum contacts" to support personal jurisdiction if the defendant "purposefully avails itself" of the privileges, *750 benefits, and protections of the forum state, such that the defendant "should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz , 471 U.S. 462, 474-75, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting Hanson v. Denckla , 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), and World-Wide Volkswagen Corp. v. Woodson , 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) ). "In determining whether a defendant has sufficient 'minimum contacts,' we consider the contacts alleged by the plaintiff in the aggregate and not individually, by looking at the totality of the circumstances." Rilley , 884 N.W.2d at 337. The forum State " 'does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State' and those products subsequently injure forum consumers." Burger King Corp. , 471 U.S. at 473, 105 S.Ct. 2174 (quoting World-Wide Volkswagen Corp. , 444 U.S. at 297-98, 100 S.Ct. 559 ).
The "minimum contacts" inquiry necessary to support specific[2] personal jurisdiction over the defendant focuses on "the relationship among the defendant, the forum, and the litigation." Walden , 571 U.S. at 284, 134 S.Ct. 1115 (citation omitted) (internal quotation marks omitted). The "defendant's suit-related conduct must create a substantial connection with the forum State." Id. Physical presence by the defendant in the forum state is not required for specific personal jurisdiction-rather, sufficient minimum contacts may exist when an out-of-state defendant "purposefully direct[s]" activities at the forum state, and the litigation "arise[s] out of or relate[s]" to those activities. Burger King Corp. , 471 U.S. at 472, 105 S.Ct. 2174 (citation omitted) (internal quotation marks omitted). This minimum-contacts inquiry must "look[ ] to the defendant's contacts with the forum State itself" and not the defendant's "random, fortuitous, or attenuated" contacts with "persons affiliated with the State" or "persons who reside there." Walden , 571 U.S. at 285-86, 134 S.Ct. 1115. Substantial contacts with the forum do not compensate for a lack of a connection "between the forum and the specific claims at issue." Bristol-Myers Squibb , --- U.S. ----, 137 S. Ct. at 1781.
A.
Although Ford does not contest the quality or quantity of its contacts with Minnesota, a description of those contacts is necessary for us to determine "the relationship among the defendant, the forum, and the litigation." Walden , 571 U.S. at 284, 134 S.Ct. 1115 (citation omitted) (internal quotation marks omitted). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State ...." Hanson , 357 U.S. at 253, 78 S.Ct. 1228. The court of appeals held that Ford's regional advertising and marketing activities in Minnesota were contacts that were not "random, fortuitous, or attenuated" and through those contacts, Ford "purposefully availed [itself] of the forum ...." Bandemer , 913 N.W.2d at 715 (citation omitted) (internal quotation marks omitted). We agree.
Ford's data collection, marketing, and advertising in Minnesota demonstrate that *751 it delivered its product into the stream of commerce with the intention that Minnesotans purchase such vehicles. Ford collected data on how its vehicles perform through Ford dealerships in Minnesota and used that data to inform improvements to its designs and to train mechanics.[3] Ford has sold more than 2,000 1994 Crown Victoria vehicles in Minnesota. It sold about 200,000 vehicles of all types in Minnesota during a three-year period. It conducted direct-mail advertising in Minnesota and directed marketing at the state. This suit's connection with Minnesota is beyond "the mere 'unilateral activity of those who claim some relationship with a nonresident defendant,' " World-Wide Volkswagen Corp. , 444 U.S. at 298, 100 S.Ct. 559 (quoting Hanson , 357 U.S. at 253, 78 S.Ct. 1228 ); rather, the connection is based on Ford's own actions in targeting Minnesota for sales of passenger vehicles, including the type of vehicle at issue in this case.
Therefore, the court of appeals did not err in holding that the quality and quantity of Ford's contacts with Minnesota were sufficient to support personal jurisdiction.
B.
The first two factors establish that Ford has purposely availed itself of the privileges, benefits, and protections of the state of Minnesota. We turn to the third factor in our personal jurisdiction inquiry: the connection of the cause of action to Ford's contacts with the state. A corporation's "single or isolated items of activity in a state ... are not enough to subject it to suit on causes of action unconnected with the activities there." Int'l Shoe Co. , 326 U.S. at 317, 66 S.Ct. 154 (emphasis added) (citation omitted).
The court of appeals relied in part on our decision in Rilley to determine that there was an adequate connection between Ford's contacts with Minnesota and the cause of action, so as to support personal jurisdiction over Ford. Bandemer , 913 N.W.2d at 714-15. In Rilley , we noted disagreement among courts about how to apply the connectedness factor, distinguishing between a test that looks to whether the plaintiff's claim was "strictly caused by or arose out of the defendant's contacts" on the one hand, and a test that looks to whether "the contacts are substantially connected or related to the litigation" on the other hand. 884 N.W.2d at 336 We observed that although there was no evidence that certain ads "actually caused any of the claims," nevertheless the ads were "sufficiently related to the claims of respondents to survive a motion to dismiss," id. at 337, because they were the "means by which" the defendant, MoneyMutual, solicited Minnesota residents to apply for an allegedly unlawful loan. Id. at 336. We concluded that those ads were "a relevant contact with the Minnesota forum for the purpose of the minimum contacts analysis." Id. at 337.
Ford urges us to change course and instead adopt a "causal" standard for this prong, under which "the defendant's contacts *752 with Minnesota [must] have caused the plaintiff's claims" for personal jurisdiction over the defendant to be proper. It argues that Supreme Court jurisprudence consistently applies a "giving rise to" standard, consistent with a requirement of causation, and therefore, the "relating to" standard that we applied in Rilley is incorrect. It further argues that a causal standard is clearer and easier to apply. Bandemer disputes Ford's characterization of Supreme Court precedent and argues that eliminating the "relating to" possibility would be a "radical" shift in specific personal jurisdiction law. We agree with Bandemer.
First, Ford argues that our "related to" conclusion in Rilley is dicta. It argues that we held that the email contacts that MoneyMutual made with Minnesota residents were sufficient by themselves to satisfy the minimum contacts question. See Rilley , 884 N.W.2d at 337. If this assertion is true, Ford reasons, then the ad analysis was not necessary to the holding and is therefore dicta that may be reconsidered without upsetting precedent. Even if our articulation of a "relating to" standard in Rilley is dicta, it is a correct application of Supreme Court precedent.
The Supreme Court most recently addressed the minimum contacts test in its Bristol-Myers Squibb decision, which concerned whether California could exercise personal jurisdiction over a pharmaceutical company in a suit for injuries from medications sold by the defendant. --- U.S. ----, 137 S. Ct. at 1777. The Supreme Court held that California did not have personal jurisdiction over the company regarding claims by out-of-state (that is, out-of-California) plaintiffs because no connection existed between those out-of-state plaintiffs' claims and the defendant's contacts with California. Bristol-Myers Squibb , --- U.S. ----, 137 S. Ct. at 1781-82. The Court determined that sales to California residents of the drug at issue and research the defendant conducted in California on an unrelated drug were not sufficiently connected to the out-of-state plaintiffs' claims because "[t]he relevant plaintiffs are not California residents and do not claim to have suffered harm in that State" and "all the conduct giving rise to the nonresidents' claims occurred elsewhere." Id. at ----, 137 S. Ct. at 1781-82.
Ford argues that Bristol-Myers Squibb shows that the Supreme Court applies a "giving rise to" standard in place of the "arising out of or related to" standard. Ford's reading of Bristol-Myers Squibb is unpersuasive for two reasons. First, the Court in Bristol-Myers Squibb stated that "[o]ur settled principles regarding specific jurisdiction control this case," --- U.S. ----, 137 S. Ct. at 1781, which signals that the Court did not intend to depart from the "arising out of or relating to" standard it had previously applied in many cases. See, e.g. , Daimler AG v. Bauman , 571 U.S. 117, 127, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014) ; Burger King Corp. , 471 U.S. at 472-73, 105 S.Ct. 2174 ; Helicopteros Nacionales de Colombia, S.A. v. Hall , 466 U.S. 408, 414-16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Indeed, the Court repeated the "arising out of or related to" standard in its opinion, which is hardly a repudiation of that standard. Bristol-Myers Squibb , --- U.S. ----, 137 S. Ct. at 1780. Second, unlike here, the Court determined there were no connections between the alleged injury to the out-of-state plaintiffs and the forum. Id. at ----, 137 S. Ct. at 1781. It is not likely that the Court applied a new, narrower standard in a case where the plaintiffs could not even meet the established, broader standard.
Ford's next argument, that before Bristol-Myers Squibb the Court consistently applied a causal standard, is also unpersuasive. In the seminal case of International Shoe , for example, the Court described *753 the connection standard. 326 U.S. at 319, 66 S.Ct. 154. It stated that "to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state." Id. Those privileges come with obligations as well, and "so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." Id. (emphasis added). The Court then held that the taxation obligation that the State of Washington sought to enforce was sufficiently connected to International Shoe's presence in the state for personal jurisdiction to exist. Id. at 320, 66 S.Ct. 154.
More recently, in World-Wide Volkswagen , as in the current case, the plaintiffs alleged that a defect in an automobile led to severe injuries following an accident. 444 U.S. at 288, 100 S.Ct. 559. The car was sold in New York, and the accident happened in Oklahoma. Id. The Court rejected the proposition that the vehicle's mobility made it foreseeable that it might travel to Oklahoma, sufficing to establish personal jurisdiction in that state over the vehicle's distributor and retail dealer. Id. at 295, 100 S.Ct. 559. But before announcing its rejection of that proposition, the Court emphatically described the defendants' complete lack of contacts with Oklahoma:
Petitioners carry on no activity whatsoever in Oklahoma. They close no sales and perform no services there. They avail themselves of none of the privileges and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market.
Id. Were we to adopt Ford's position here, we would be reading out of the World-Wide Volkswagen decision everything the majority wrote about the defendant's lack of contacts with Oklahoma. If the particular vehicle was not designed, manufactured, or sold in Oklahoma, on Ford's theory, then it would not have mattered if the defendant sold millions of cars in Oklahoma. We decline to adopt a rule that would render irrelevant so much of the Court's reasoning.
The Court in Bristol-Myers Squibb stated it was not departing from settled principles of specific personal jurisdiction. We believe it. Therefore, we decline to adopt Ford's causal standard.
C.
Ford also argues that its contacts with Minnesota do not meet the "relating to" standard. It argues that "[n]o part of Ford's allegedly tortious conduct-designing, manufacturing, warrantying, or warning about the 1994 Crown Victoria-occurred in Minnesota." Those contacts are only those that cause the claim, though. As we explained above, the requirements of due process are met so long as Ford's contacts relate to the claim. Rilley , 884 N.W.2d at 337.
This is not a case where a 1994 Ford Grand Victoria fortuitously ended up in Minnesota. Ford has sold thousands of such Crown Victoria cars and hundreds of thousands of other types of cars to dealerships in Minnesota.[4] Because the Crown *754 Victoria is the very type of car that Bandemer alleges was defective, Ford's sales to the Minnesota dealerships are connected to the claims at issue here. Bandemer's claims are about the design of the Crown Victoria and therefore his claims are about more than one specific car. Ford also collected data on how its cars performed through Ford dealerships in Minnesota and used that data to inform improvements to its designs and to train mechanics. Part of Bandemer's claim is that Ford failed to detect a defect in its vehicle design. Those activities, and the failure to detect, likewise relate to the claims here. Ford directs marketing and advertisements directly to Minnesotans, with the hope that they will purchase and drive more Ford vehicles. A Minnesotan bought a Ford vehicle, and it is alleged that the vehicle did not live up to Ford's safety claims. "In determining whether a defendant has sufficient 'minimum contacts,' we consider the contacts alleged by the plaintiff in the aggregate and not individually, by looking at the totality of the circumstances." Rilley , 884 N.W.2d at 337.
Beyond Ford's sales, marketing, and research contacts with Minnesota, there is an " 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.' " Bristol-Myers Squibb , --- U.S. ----, 137 S. Ct. at 1781 (quoting Goodyear , 564 U.S. at 919, 131 S.Ct. 2846 ). In Bristol-Myers Squibb , the Court considered the claims of non-forum residents who did not allege that any relevant facts relating to their claim occurred in the forum, and concluded that, absent such allegations, personal jurisdiction was lacking. Id . at ----, 137 S. Ct. at 1782. In the current case, by contrast, the car crash and the injury to the plaintiff occurred in Minnesota, the car was registered in Minnesota, the plaintiff and the driving defendant are Minnesota residents, and the plaintiff was treated for the injuries in Minnesota.
For these reasons, this case meets the requirement from Bristol-Myers Squibb that an "activity or an occurrence ... take[ ] place in" Minnesota. The dissent disputes the relevance of a plaintiff's contacts with the forum. In fact, our analysis tracks the Court's analysis in Bristol-Myers Squibb. --- U.S. ----, 137 S. Ct. at 1781. After rejecting the Supreme Court of California's "sliding scale" approach as a "loose and spurious form of general jurisdiction," the Court described the nonresident plaintiffs' lack of connection with the forum. Id. It specifically mentioned the lack of injury to these plaintiffs in California, and concluded that "a connection between the forum and the specific claims at issue" was "missing." Id. The Court's discussion of the lack of plaintiffs' contacts with the forum demonstrates that the plaintiff's contacts are relevant to the analysis of the "affiliation between the forum and the underlying controversy ...." Id. (citation omitted) (internal quotation marks omitted).
*755 Because there is a substantial connection between the defendant Ford, the forum Minnesota, and the claims brought by Bandemer, Ford's contacts with Minnesota suffice to establish specific personal jurisdiction over the company regarding Bandemer's claims.
II.
If sufficient "minimum contacts" are established, we must consider the "reasonableness" of personal jurisdiction according to traditional notions of "fair play and substantial justice," weighing factors such as the convenience of the parties and the interests of the forum state in adjudicating the dispute. Burger King Corp. , 471 U.S. at 476-77, 105 S.Ct. 2174 (citing World-Wide Volkswagen Corp. , 444 U.S. at 292, 100 S.Ct. 559 ). To establish specific personal jurisdiction, "the facts of each case must [always] be weighed in determining whether personal jurisdiction would comport with fair play and substantial justice." Id. at 485-86, 105 S.Ct. 2174 (citation omitted) (internal quotation marks omitted). We examine these questions through factors four and five of our test: Minnesota's interest in the litigation, and the convenience of the parties. Rilley , 884 N.W.2d at 338.
Ford concedes that these factors are established, and therefore support an exercise of jurisdiction. We agree. Minnesota has a strong interest in adjudicating this dispute regarding an accident involving a Minnesota county vehicle that occurred on a Minnesota road, between a Minnesota resident as plaintiff and both Ford-a corporation that does business regularly in Minnesota-and two Minnesota residents as defendants. Minnesota has a vital interest in protecting the safety and rights of its residents, in regulating the safety of its roadways, and in safeguarding Ford's co-defendants' rights. Minnesota's interest is expressed in its state constitution, which provides: "Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws." Minn. Const. art. I, § 8. If complete, prompt, and economical justice are the goals, Minnesota is also the most convenient forum, as the site of the accident and treatment for the injury. Plainly, Minnesota has an interest in adjudicating this dispute and is the most convenient place to do it.
Here, we hold that Ford's contacts alone are sufficient to support specific personal jurisdiction and the reasonableness factors, which heavily favor jurisdiction, do not detract from the reasonableness of asserting jurisdiction over Ford here. After examining "the relationship among the defendant, the forum, and the litigation," we hold that Minnesota's exercise of specific personal jurisdiction over Ford in this case does not violate due process. Walden , 571 U.S. at 287, 134 S.Ct. 1115 (citation omitted) (internal quotation marks omitted).
CONCLUSION
For the foregoing reasons, we affirm the decision of the court of appeals.
Affirmed.
Dissenting, Anderson, J., Gildea, C.J.
DISSENT

Bandemer also argued below that Ford consented to personal jurisdiction by consenting to receive service of process through an agent in Minnesota. See Minn. Stat. § 303.06 (2018) (requiring that a foreign corporation "irrevocably consent[ ] to the service of process upon it"); Minn. Stat. § 303.13, subd. 1(1) (2018) ("A foreign corporation shall be subject to service of process ... by service on its registered agent ...."). Consent-based jurisdiction exists independently of specific personal jurisdiction, and federal courts have held that "[o]ne of the most solidly established ways of giving such consent is to designate an agent for service of process within the State." Knowlton v. Allied Van Lines, Inc. , 900 F.2d 1196, 1199 (8th Cir. 1990). The court of appeals did not reach this question because it held that the exercise of jurisdiction was valid under the doctrine of specific personal jurisdiction. Because it was not decided by the court of appeals in the first instance, we similarly decline to address the question of consent-based jurisdiction in this case.

The parties agree that Minnesota may not exercise general personal jurisdiction over Ford. Specific personal jurisdiction exists if the litigation "arise[s] out of or relate[s]" to the defendant's contacts with the forum. Burger King Corp. , 471 U.S. at 472, 473 n.15, 105 S.Ct. 2174.

The dissent disputes this characterization of Ford's data collection. Ford describes its data collection as: "Ford's design center collects some performance data from dealers nationally and Ford sometimes considers vehicle performance in the field to inform its overall design decisions." Ford further admitted "that it receives information regarding vehicle performance across the United States, including in Minnesota, and that information may be used by Ford as it considers future designs." But, crucially, Ford's use of the word "may" is not a denial that it collects safety-related data in Minnesota, or that its safety-related data is relevant to Bandemer's causes of action. At the motion-to-dismiss stage, we are required to accept Bandemer's allegations as true unless Ford's discovery responses directly contradict Bandemer's claims. See Rilley , 884 N.W.2d at 336.

The dissent treats the thousands of cars that Ford has sold into Minnesota as irrelevant, because "[e]ven regularly occurring sales of a product in a State do not justify the exercise of jurisdiction over a claim unrelated to those sales." (quoting Goodyear Dunlop Tires Operations, S.A. v. Brown , 564 U.S. 915, 930 n.6, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011) ). In our view, the dissent relies too heavily on Goodyear , a case in which the Court considered general jurisdiction. In Goodyear , the issue was whether foreign subsidiaries were subject to general personal jurisdiction in North Carolina. 564 U.S. at 919-20, 131 S.Ct. 2846. The quoted footnote was the Court's response to an allegation that the foreign subsidiaries sought to sell their tires in North Carolina, referring back to another section of the opinion in which it rejected "the sprawling view of general jurisdiction urged by respondents ... [that] any substantial manufacturer or seller of goods would be amenable to suit, on any claim for relief, wherever its products are distributed." Id. at 929, 131 S.Ct. 2846 (emphasis added). Regarding specific personal jurisdiction, however, the Court noted that the "[f]low of a manufacturer's products into the forum ... may bolster an affiliation germane to specific jurisdiction." Id. at 927, 131 S.Ct. 2846.