**STATE of Minnesota by its Attorney General Hubert H. HUMPHREY, III, Respondent,**

v.

**GRANITE GATE RESORTS, INC., d/b/a On Ramp Internet Computer Services; et al., Appellants.**

No. C6–97–89.

Court of Appeals of Minnesota.

Sept. 5, 1997.

Review Granted Oct. 31, 1997.

Hubert H. Humphrey III, Attorney General, Carolyn P. Ham, Ann Beimdiek Kinsella, Assistant Attorneys General, St. Paul, for Respondent.

Ronald I. Meshbesher, Meshbesher & Spence, Minneapolis, and Eckley M. Keach, Goodman, Chesnoff & Keach, Las Vegas, NV, for Appellants.

Considered and decided by WILLIS, P.J., and CRIPPEN and HARTEN, JJ.

## OPINION

WILLIS, Judge.

Respondent State of Minnesota filed a complaint against appellants Granite Gate Resorts, Inc., d/b/a On Ramp Internet Computer Services, and Kerry Rogers, individually and as principal officer of Granite Gate

Resorts, Inc., alleging that appellants engaged in deceptive trade practices, false advertising, and consumer fraud on the Internet. Appellants challenge the district court's denial of their motion to dismiss for lack of personal jurisdiction. We affirm.

## FACTS

Rogers, a Nevada resident, is president of Granite Gate, a Nevada corporation that does business as On Ramp. Until August 1995, On Ramp provided Internet advertising on the site located at http://www.vegas.com, which provides Nevada tourist information. Among the sites advertised was WagerNet, an on-line wagering service planned to be available internationally in the fall of 1995, whose page enabled Internet users to subscribe for more information about the service.

The WagerNet site, designed by Rogers, stated:

**On-Line sports wagering open to International markets, Fall of 1995**

Global Gaming Services Ltd., based in the country of Belize, is pleased to introduce *WagerNet,* the first and only on-line sports betting site on the Internet. *WagerNet* will provide sports fans with a legal way to bet on sporting events from anywhere in the world ... **24 Hours a Day!**

How it Works

First, there is a $100 setup fee, for necessary hardware and software. For security and privacy, all members are issued a card system linked to their personal computer to access *WagerNet.* Once on-line, the bettor selects the team/s and amount/s they wish to wager. *WagerNet* then matches your bet with an opposing bettor or bettors to cover your wager. *WagerNet* charges each bettor a transaction fee of **ONLY 2.5%** as opposed to the 10% fee charged by most bookmakers.

The website invited Internet users to put themselves on a mailing list for WagerNet information and included a form for that purpose. It gave a toll-free number for WagerNet and also told Internet users to contact On Ramp at a Nevada telephone number for more information. A note on the page advised users to consult with local authorities regarding restrictions on offshore sports betting by telephone before registering with WagerNet.

A linked web page listed the terms and conditions to which an Internet user assented by applying for the private access card and special hardware and software required to access WagerNet's services. This page stated that any claim against WagerNet by a customer must be brought before a Belizian court, but that WagerNet could sue the consumer in his or her home state to prevent the consumer "from committing any breach or anticipated breach of this Agreement and for consequential relief."

On July 5, 1995, Jeff Janacek, a consumer investigator for the Minnesota Attorney General's office, telephoned the toll-free number shown on an On Ramp site that advertised All Star Sports, a sports handicapping service, and asked how to bet on sports events. An On Ramp employee told Janacek to call Rogers directly. Janacek dialed the number he was given, which was the same number that the WagerNet site directed Internet users to call to receive more information, and spoke with an individual who identified himself as Rogers. Janacek identified himself as a Minnesotan interested in placing bets. Rogers explained how to access WagerNet, told Janacek the betting service was legal, and stated that he hoped the service would be up and running by the 1995 football season.

In July 1995, the attorney general filed a complaint alleging that appellants had engaged in deceptive trade practices, false advertising, and consumer fraud by advertising in Minnesota that gambling on the Internet is lawful. In October 1995, Janacek subscribed to the WagerNet mailing list under a fictitious name and received an on-line confirmation stating that he would be sent updates on the WagerNet service. Appellants filed a motion to dismiss for lack of personal jurisdiction. The district court allowed limited discovery to determine the quantity and quality of appellants' contacts with the state. Rogers refused to produce the names of the persons on the WagerNet mailing list, claiming that the information is the sole property

of a Belizian corporation. As a sanction, the court found that it is established as a fact for this action that the WagerNet mailing list contains the name and address of at least one Minnesota resident. In December 1996, the district court denied appellants' motion to dismiss for lack of jurisdiction.

### ISSUE

Did the district court err in denying appellants' motion to dismiss for lack of personal jurisdiction?

### ANALYSIS

This is the first time a Minnesota court has addressed the issue of personal jurisdiction based on Internet advertising. We are mindful that the Internet is a communication medium that lacks historical parallel in the potential extent of its reach and that regulation across jurisdictions may implicate fundamental First Amendment concerns. It will undoubtedly take some time to determine the precise balance between the rights of those who use the Internet to disseminate information and the powers of the jurisdictions in which receiving computers are located to regulate for the general welfare. But our task here is limited to deciding the question of personal jurisdiction in the instant case, and on the facts before us, we are satisfied that established legal principles provide adequate guidance.

Minnesota's long-arm statute, Minn. Stat. § 543.19 (1996), "permits courts to assert jurisdiction over defendants to the extent that federal constitutional requirements of due process will allow." *Domtar, Inc. v. Niagara Fire Ins. Co.*, 533 N.W.2d 25, 29 (Minn.), *cert. denied*, —— U.S. ——, 116 S.Ct. 583, 133 L.Ed.2d 504 (1995). To satisfy the Due Process Clause of the Fourteenth Amendment, a plaintiff must show that the defendant has "minimum contacts" with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)). There must be "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958).

Appellants allege that the district court erred in denying their motion to dismiss because a nonresident defendant that places information on the Internet has not purposefully availed itself of the privilege of conducting activities within every state from which that information may be accessed. The assertion of personal jurisdiction in Minnesota, appellants argue, would not comport with the traditional notions of fair play and substantial justice.

A court must consider five factors in determining whether a defendant has established minimum contacts with the forum state: (1) the quantity of the defendant's contacts; (2) the nature and quality of the defendant's contacts; (3) the connection between the cause of action and the defendant's contacts; (4) the state's interest in providing a forum; and (5) the convenience of the parties. *Rostad v. On–Deck, Inc.*, 372 N.W.2d 717, 719–20 (Minn.1985). The first three factors are of primary importance. *Land–O–Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1340 (8th Cir.1983). In close cases, "doubts should be resolved in favor of retention of jurisdiction." *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 411–12 (Minn.1992).

### 1. Quantity of Contacts.

The quantity of contacts here supports the contention that appellants purposefully availed themselves of the privilege of conducting commercial activities in Minnesota. The district court found that (1) computers located throughout the United States, including Minnesota, accessed appellants' websites, (2) during a two-week period in February and March 1996, at least 248 Minnesota computers accessed and "received transmissions from" appellants' websites, (3) computers located in Minnesota are among the 500 computers that most often accessed appellants' websites, (4) persons located

throughout the United States, including persons in Minnesota, called appellants at the numbers advertised on its websites, and (5) the WagerNet mailing list includes the name and address of at least one Minnesota resident.

In *Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1328 (E.D.Mo.1996), a Missouri federal court exercised personal jurisdiction over the California operator of an Internet site that provided information on a forthcoming service that would charge advertisers for access to a mailing list of Internet users. *Id.* at 1334. In analyzing the quantity of the defendant's contacts with Missouri, the *Maritz* court found that the defendant "has transmitted information into Missouri regarding its services approximately 131 times," which allowed an inference that the defendant purposefully availed itself of the privilege of conducting activities in Missouri. *Id.* at 1333. The quantity of contacts here exceeds that in *Maritz.*

### 2. Quality of Contacts.

 Even where the quantity of contacts with a state is minimal, the nature and quality of the contacts may be dispositive. *Trident Enters. Int'l, Inc. v. Kemp & George, Inc.,* 502 N.W.2d 411, 415 (Minn.App.1993); *see also Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119, 1124 (W.D.Pa.1997) (concluding "likelihood that personal jurisdiction can be constitutionally exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the internet"). Advertising in the forum state, or establishing channels for providing regular advice to customers in the forum state, indicates a defendant's intent to serve the market in that state. *Asahi Metal Indus. Co. v. Superior Court of California,* 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987).

Appellants argue that they "have not directed their activities at the citizens of Minnesota" because they "only placed information on the internet." An Internet site, however, can be viewed as

> an "advertisement" by which [the foreign corporation] distributes its pictorial images throughout the United States. That the local user "pulls" these images from [the corporation's] computer in [in that case] Italy, as opposed to [the corporation] "sending" them to this country, is irrelevant. By inviting United States users to download these images, [the corporation] is causing and contributing to their distribution within the United States.

*Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.,* 939 F.Supp. 1032, 1044 (S.D.N.Y.1996).

The *Maritz* court also rejected the view that Internet advertising is a passive activity:

> [Defendant's] posting of information about its new, up-coming service through a website seeks to develop a mailing list of internet users, as such users are essential to the success of its service. Clearly, [the defendant] has obtained the website for the purpose of, and in anticipation that, internet users, searching the internet for websites, will access [the defendant's] website and eventually sign up on [the defendant's] mailing list. Although [the defendant] characterizes its activity as merely maintaining a "passive website," its intent is to reach all internet users, regardless of geographic location. * * * Through its website, [the defendant] has consciously decided to transmit advertising information to all internet users, knowing that such information will be transmitted globally.

*Id.* at 1333; *see also Inset Sys., Inc. v. Instruction Set, Inc.,* 937 F.Supp. 161, 165 (D.Conn.1996) (holding that Massachusetts corporation purposefully availed itself of privilege of doing business in Connecticut by advertising its activities and its toll-free number on Internet because Internet and toll-free numbers are designed to communicate with people in every state).

Minnesota courts have concluded that defendants who know their message will be broadcast in this state are subject to suit here. *See, e.g., Tonka Corp. v. TMS Entertainment, Inc.,* 638 F.Supp. 386, 391 (D.Minn.1985) (holding that Minnesota can exert personal jurisdiction over California corporation that produced television program it knew would be broadcast nationwide); *BLC Ins. Co. v. Westin, Inc.,* 359 N.W.2d

752, 755 (Minn.App.1985) (holding that Wisconsin corporation's purposeful behavior in advertising its Wisconsin bar on Twin Cities radio station is such that it should have reasonably anticipated being haled into Minnesota court), *review denied* (Minn. Apr. 15, 1985); *see also A. Uberti & C. v. Leonardo,* 181 Ariz. 565, 892 P.2d 1354, 1362 (1994) (concluding that defendant intending to sell its products to any and all United States citizens can be held accountable in any jurisdiction where its products cause injury), *cert. denied,* — U.S. —, 116 S.Ct. 273, 133 L.Ed.2d 194 (1995). Other states have held that direct mail solicitation into the state is sufficient contact to justify personal jurisdiction. *See, e.g., State ex rel. Miller v. Baxter Chrysler Plymouth, Inc.,* 456 N.W.2d 371, 377 (Iowa 1990); *Kugler v. Market Dev. Corp.,* 124 N.J.Super. 314, 306 A.2d 489, 491 (Ch.Div.1973); *State v. Colorado State Christian College,* 76 Misc.2d 50, 346 N.Y.S.2d 482, 485 (N.Y.Sup.Ct.1973); *State v. Reader's Digest Ass'n, Inc.,* 81 Wash.2d 259, 501 P.2d 290, 302 (1972).

Internet advertisements are similar to broadcast and direct mail solicitation in that advertisers distribute messages to Internet users, and users must take affirmative action to receive the advertised product. Here, the WagerNet site itself stated that it was "open to International markets," indicating an intent to seek customers from a very broad geographic area. The fact that WagerNet had apparently paid for advertising in English on an American commercial site indicates an intent to reach the American market, and by advertising their services with a toll-free number, appellants indicated their intent to solicit responses from all jurisdictions within that market, including Minnesota. A defendant cannot "hide behind the structuring of its distribution system when [the defendant's] intent was to enter the market [in the forum state] and profit thereby." *Rostad,* 372 N.W.2d at 722. The presence of the disclaimer on the site may be relevant to the merits of the consumer fraud action, but appellants' clear effort to reach and seek potential profit from Minnesota consumers provides minimum contacts of a

nature and quality sufficient to support a threshold finding of personal jurisdiction.[1]

### 3. Connection Between Cause of Action and Contacts.

■ If the cause of action arises from the nonresident defendant's contacts with the forum state, even a single transaction can be sufficient to establish personal jurisdiction over the defendant. *See McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). Advertising contacts justify the exercise of personal jurisdiction where unlawful or misleading advertisements are the basis of the plaintiff's claims. *See Baxter,* 456 N.W.2d at 377 (holding that defendants' acts in advertising within forum state are sufficient to render them amenable to suit there in action alleging the advertising is unlawful); *Reader's Digest,* 501 P.2d at 302–03 (concluding that unfair competition cause of action arose from contacts because mailing sweepstakes entry information constituted illegal lottery within state).

In this case, the state alleges violations of Minn.Stat. §§ 325D.44, subd. 1 (1996) (engaging in deceptive trade practices), 325F.67 (1996) (making false statements in advertisements), and 325F.69, subd. 1 (1996) (engaging in fraud, misrepresentation, or deceptive practices), based on appellants' alleged misrepresentations regarding the legality in Minnesota of the services offered by All Star Sports and WagerNet. Under Minn.Stat. § 8.31, subd. 3 (1996), the attorney general is authorized to seek injunctive relief and civil penalties when satisfied that any of the laws referred to in Minn.Stat. § 8.31, subd. 1 (1996), which include the consumer statutes allegedly violated here, "is about to be violated." Thus, the causes of action against appellants arise out of the information that appellants posted on their website inviting Internet users to use the on-line gambling service when it becomes operational, which, as discussed, was directed toward Minnesota and received here. *See Maritz,* 947 F.Supp. at 1333 (concluding that trademark infringement and unfair competition causes of action

---

1. The balance of equities may be different where a defendant disseminates a message on the Internet for a purpose other than the solicitation of business, but we need not decide that issue here.

result from injuries that arise out of or relate to defendant's website).

### 4. State's Interest.

■ Minnesota's interest in providing a forum for a resident plaintiff cannot alone establish jurisdiction, but it can support the exercise of jurisdiction over a nonresident defendant when viewed in light of the first three factors for evaluating whether minimum contacts exist. *Trident,* 502 N.W.2d at 416. The state has an interest in enforcing consumer protection statutes and regulating gambling. *See State v. Alpine Air Products, Inc.,* 490 N.W.2d 888, 892 (Minn.App.1992) (concluding that consumer fraud statutes were designed to protect and enhance public interests), *aff'd,* 500 N.W.2d 788 (Minn.1993); *see also State v. Brown,* 486 N.W.2d 816, 817 (Minn.App.1992) (concluding that Minnesota gambling industry "is highly regulated to prevent its commercialization and to ensure that profits generated from gambling are used for lawful purposes"). The state's interest in providing a forum to enforce its consumer protection laws weighs in favor of exerting jurisdiction over appellants. *See Reader's Digest,* 501 P.2d at 303 (holding that Washington court had jurisdiction over foreign defendant that advertised there, noting that "[i]f our courts are not open, the state will be without a remedy in any court and the Consumer Protection Act will be rendered useless").

### 5. Convenience of Parties.

The convenience of the parties is "of minor interest in comparison to the first three factors." *Rostad,* 372 N.W.2d at 722.

> As technological progress has increased the flow of commerce between States, * * * progress in communications and transportation has made defense of a suit in a foreign tribunal less burdensome.

*Hanson,* 357 U.S. at 250–51, 78 S.Ct. at 1238.

Appellants argue that the district court placed excessive weight on WagerNet's statement that it reserved the right to sue customers in the customer's home forum or Belize, at WagerNet's option, because WagerNet is not a party to this action. The district court's decision, however, does not rely significantly on WagerNet's claimed choice of forums. Moreover, appellants do not contest the district court's finding that appellant Rogers "makes all the decisions regarding WagerNet." "Foreign" corporations that seek business in Minnesota and reserve the right to sue Minnesota customers in courts here cannot claim inconvenience as an excuse to avoid personal jurisdiction here, particularly in light of the state's interest in regulating advertising and gambling. Appellants, an American corporation and its officer, who facilitated WagerNet's solicitation of business in Minnesota, have not shown that the inconvenience of defending themselves in Minnesota would be so great, by itself, as to offend traditional notions of due process.

### DECISION

Appellants, through their Internet advertising, have demonstrated a clear intent to solicit business from markets that include Minnesota and, as a result, have had multiple contacts with Minnesota residents, including at least one successful solicitation. The cause of action here arises from the same advertisements that constitute appellants' contacts with the state and implicates Minnesota's strong interest in maintaining the enforceability of its consumer protection laws. Appellants have not demonstrated that submission to personal jurisdiction in Minnesota would subject them to any undue inconvenience. For these reasons, we hold that appellants are subject to personal jurisdiction in Minnesota because, through their Internet activities, they purposefully availed themselves of the privilege of doing business in Minnesota to the extent that the maintenance of an action based on consumer protection statutes does not offend traditional notions of fair play and substantial justice.

**Affirmed.**