Dear Dentistry Campbell,
¶ 0 This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:
Does the Oklahoma Board of Dentistry (the "Board") haveregulatory authority over dental services provided in Oklahomavia the Internet?
¶ 1 You present a fact situation in which an out-of-state dentist hosted a website on the Internet through which an Oklahoma resident described her dental problems and obtained a prescription for an antibiotic. Upon taking the antibiotic, the individual suffered an allergic reaction, and registered a complaint with your office.
¶ 2 The legal system has historically relied upon geographical boundaries to define the jurisdiction of governments. Modern transportation and communications have brought an increasing amount of economic activity across those boundaries. The Internet exposes Oklahoma residents to contact with people across the globe as easily as it does across the street. Your question focuses on the legal authority of the Board to regulate individuals whose nexus with Oklahoma is through the Internet alone.
¶ 3 There is no State statute specifically addressing the use of the Internet by individuals who, if they were physically present and practicing dentistry within the geographic borders of the State of Oklahoma, would irrefutably be under the jurisdiction of the Board. To answer your question, we must analyze both the Dental Act and the principles of long-arm jurisdiction.
THE BOARD OF DENTISTRY
¶ 4 The Board is typical of numerous professional licensing boards in the State of Oklahoma. The acts constituting the practice of dentistry include representing to the public that the person: is a dentist; is authorized to practice dentistry; or is able to diagnose and treat diseases or disorders of the teeth, gums and associated structures. See 59 O.S. 328.19(A)(1)/59O.S. 328.19(A)(2)/59 O.S. 328.19(A)(4) (1999). Dentistry also includes: prescribing for any disease or pain of the mouth; administering anesthetics; providing or repairing dentures and bridges; interpreting dental X-rays; and owning a financial interest in a dental office. See id. 59 O.S. 328.19(A)(8)/59O.S. 328.19(A)(10)/59 O.S. 328.19(A)(14)/59 O.S.328.19(A)(15)/59 O.S. 328.19(A)(17) and 59 O.S.328.19(A)(18) (1999).
¶ 5 It is a misdemeanor, punishable by fine and/or imprisonment, to practice dentistry without a license issued by the Board. See 59 O.S. 328.49(C)(2) (1999). The Board may obtain a temporary restraining order or injunction "commanding a person to refrain from" violating this law; violation of such a court order can result in imprisonment and fines. Id. 59 O.S.328.49(C)(2)/59 O.S. 328.49(D). Licenses may be granted to out-of-state dentists in good standing who have been licensed and practicing in another state with comparable standards for at least five years. See 59 O.S. 328.23(A) (1999).
THE INTERNET
¶ 6 The difficulty posed by your question is the nature of the Internet itself. It began as part of a Cold War-era U.S. Department of Defense program to link the computers of scientific researchers, and has mushroomed into a revolutionary new medium of communication for individuals and businesses around the world.
¶ 7 In ACLU v. Reno, 929 F. Supp. 824 (E.D. Pa. 1996), the federal district court made findings of fact in which it summarized the creation of the Internet and how individuals access the Internet.
 "11. No single entity — academic, corporate, governmental, or non-profit — administers the Internet. It exists and functions as a result of the fact that hundreds of thousands of separate operators of computers and computer networks independently decided to use common data transfer protocols to exchange communications and information with other computers (which in turn exchange communications and information with still other computers). There is no centralized storage location, control point, or communications channel for the Internet, and it would not be technically feasible for a single entity to control all of the information conveyed on the Internet.
 "43. Web publishers have a choice to make their Web sites open to the general pool of all Internet users, or close them, thus making the information accessible only to those with advance authorization. Many publishers choose to keep their sites open to all in order to give their information the widest potential audience. In the event that the publishers choose to maintain restrictions on access, this may be accomplished by assigning specific user names and passwords as a prerequisite to access to the site. Or, in the case of Web sites maintained for internal use of one organization, access will only be allowed from other computers within that organization's local network.
* * * * *
 "46. A distributed system with no centralized control. Running on tens of thousands of individual computers on the Internet, the Web is what is known as a distributed system. The Web was designed so that organizations with computers containing information can become part of the Web simply by attaching their computers to the Internet and running appropriate World Wide Web software. No single organization controls any membership in the Web, nor is there any single centralized point from which individual Web sites or services can be blocked from the Web. From a user's perspective, it may appear to be a single, integrated system, but in reality it has no centralized control point."
Id. at 832, 837, 838 (emphasis added). Congress has defined the Inter-net as "the international computer network of both Federal and non-Federal interoperable packet switched data networks."47 U.S.C.A. 230(f)(1) (1998).
JURISDICTIONAL ANALYSIS
¶ 8 Traditionally, jurisdiction over the person was based on the individual's physical presence in the forum. This continues to be a conventional basis for jurisdiction.[1] SeeBurnham v. Superior Court 495 U.S. 604 (1990). Advances in technology and communications, along with society's increased physical mobility, have challenged the legal system's attempts to settle the legal principles. See Hanson v. Denckla,357 U.S. 235, 250-51 (1958). ("As technological progress has increased the flow of commerce between the States, the need for jurisdiction over nonresidents has undergone a similar increase."); BurgerKing Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985 ("It is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted."). The Internet represents only the most recent development in this process.
¶ 9 The legal system has dealt with disputes over entities such as corporations that have no physical situs (see Hutchinson v.Chase Gilbert Inc., 45 F.2d 139, 142 (2d Cir. 1930)) and over properties such as stocks (see Shaffer v. Heitner, 433 U.S. 186
(1977)) and debts (see Harris v. Balk, 198 U.S. 215 (1905)) that similarly lack physical form. As a result, the Supreme Court began relying on contacts other than physical presence in a state to determine the appropriate jurisdiction. In International ShoeCo. v. Washington, 326 U.S. 310 (1945), the Court established that state courts may assert jurisdiction over a defendant who has sufficient "minimum contacts" in the forum state. Id. at 316; see also World-Wide Volkswagen Corp v. Woodson,444 U.S. 286, 291 (1980) (citing International Shoe, 326 U.S. at 316).
¶ 10 Two broad classes of jurisdiction — general and specific — have been recognized. General jurisdiction allows a state to exercise personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with that state, where the defendant's other contacts with the state are systematic and continuous enough to render jurisdiction reasonable and just. See Helicopteros Nacionales De Colombia,S.A., v. Hall, 466 U.S. 408, 414-15 n. 9 (1984).
¶ 11 On the other hand, under the specific jurisdiction approach, jurisdiction can be asserted where a defendant's contact arise out of the facts of the case and the defendant has at least "minimum contacts" with the forum state, such that he might anticipate defending that particular type of claim. The contacts may be isolated or occasional as long as they are purposefully directed toward, or have an effect in, the forum state. See International Shoe, 326 U.S. at 319-20. The exercise of jurisdiction must also be reasonable, with a focus on "fair play and substantial justice." Burger King, 471 U.S. at 476
(quoting International Shoe, 326 U.S. at 320).
¶ 12 Expanding upon World-Wide Volkswagen, Calder v. Jones465 U.S. 783 (1984), authorized jurisdiction where the defendant committed intentional acts expressly aimed at the forum state, which caused harm in the forum state that the defendant knew or should have known was likely to be suffered there. In Calder, the National Enquirer, a Florida corporation, published a derogatory article about California-based actress Shirley Jones.
 "Petitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article. . . . An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California."
Id. at 789-90 (citations omitted). This test has been successfully applied to the Internet in civil litigation.
¶ 13 In Intercon Inc. v. Bell Atlantic Internet SolutionsInc., 205 F.3d 1244 (10th Cir. 2000), the plaintiff, an Oklahoma corporation, suffered business interference when the defendant, a Delaware corporation doing business on the East Coast, mistakenly routed its customers' e-mail messages through the plaintiff's server. The appellate court held that the state maintains general personal jurisdiction over the defendant "if the defendant has purposefully directed his activities at residents of the forum."Id. at 1247 (quoting Burger King, 471 U.S. at 472). Notably, the Tenth Circuit recognized that "Oklahoma has a `manifest interest' in providing a forum in which its residents can seek redress for intentional injuries caused by out-of-state actors."Id. at 1249 (quoting Burger King, 471 U.S. at 473).
¶ 14 The Ninth Circuit Court of Appeals has observed that in each case where personal jurisdiction was exercised, "there has been `something more' than an Internet advertisement alone to indicate that the defendant purposefully (albeit electronically) directed his activity in a substantial way to the forum state."Cybersell Inc. v. Cybersell, Inc., 130 F.3d 414, 418 (9th Cir. 1997). In Cybersell, an Arizona corporation applying for a federal servicemark for the name "Cybersell" filed a trademark infringement suit in Arizona against a Florida corporation which had created a passive webpage using that name. On appeal, the court denied jurisdiction in Arizona, noting there was no inference that the Florida corporation deliberately directed any merchandising efforts toward Arizona residents.
¶ 15 In State v. Granite Gate Resorts, Inc. 568 N.W.2d 715
(Minn. 1997), the appellate court recognized that the State of Minnesota properly had jurisdiction in an action for deceptive trade practices, false advertising and consumer fraud against a Nevada company for allowing an online wagering service to advertise and do business through the defendant's webpage.[2]
¶ 16 In Maritz Inc. v. Cybergold Inc. 947 F. Supp. 1328 (E.D. Mo. 1996), the court took a similar approach. The California-based operator of an Internet site was held subject to the Missouri court's jurisdiction in a trademark infringement case because the operator's activities allegedly caused economic injury to the plaintiff corporation in Missouri. The court determined that by advertising as it did, the defendant purposefully availed itself of the privilege of doing business within Missouri, which satisfied the state's long-arm statute. See id.
¶ 17 Using this jurisdictional analysis, the Oklahoma Board of Dentistry may therefore assert jurisdiction over out-of-state parties who affect Oklahoma residents via the Internet, in the same manner as the State Dental Act and the Board's rules are applied to in-state parties. Whether jurisdiction exists will depend on the unique facts of each case and the extent to which the out-of-state actor avails himself or herself of the privilege of doing business with people residing in Oklahoma. The test is whether the actor purposefully directed his or her activity in a substantial way toward Oklahoma residents, and whether the actor knew or should have known that the resulting harm was likely to be suffered in Oklahoma by his or her actions. For example, an out-of-state party can publish a website, identifying himself or herself as a dentist in his or her jurisdiction. However, if the out-of-state party solicits or engages in Internet correspondence with an Oklahoma resident, and dispenses drugs or sells dentures as a result of that correspondence, the line has been crossed. The regulation of professions exists to protect the people of Oklahoma, and cannot be avoided simply by reaching from across the State's geographic border to practice dentistry in this State.
¶ 18 It is, therefore, the official Opinion of the AttorneyGeneral that:
Under appropriate facts, the Oklahoma Board of Dentistry hasauthority to regulate individuals physically located outside theState who practice dentistry (as defined in the State DentalAct, 59 O.S. 328/59 O.S. 328.51a) in the State ofOklahoma via the Internet.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
WALTER W. JENNY JR. ASSISTANT ATTORNEY GENERAL
[1] Jurisdictional analysis is especially appropriate here given the Board's judicial power. See OKLA. CONST. Article VII, Section 1.
[2] The wagering service's webpage included a statement that any claim against it by a customer must be brought before a court in the Central American country of Belize, but that the wagering company could sue the consumer in his or her home state to prevent the consumer "from committing any breach or anticipated breach of this Agreement and for consequential relief." GraniteGate Resorts, 568 N.W.2d at 717.