STATE OF MINNESOTA

IN SUPREME COURT

A14-1307

Court of Appeals                                                                    Anderson, J.
                                                  Took no part, Lillehaug, Chutich, JJ.

Scott Rilley, et al.,

       Respondents,

vs.                                                                         Filed: August 24, 2016
                                                                    Office of Appellate Courts

MoneyMutual, LLC,

       Appellant.

_____

E. Michelle Drake, John G. Albanese, Berger & Montague, P.C., Minneapolis, Minnesota;

Mark Heaney, Heaney Law Firm, LLC, Minnetonka, Minnesota and;

Daniel C. Bryden, Bryden Law Firm, LLC, Minneapolis, Minnesota, for respondents.

Thomas H. Boyd, Joseph M Windler, Chistina Rieck Loukas, Winthrop & Weinstine, P.A., Minneapolis, Minnesota and;

Donald J. Putterman, Michelle L. Landry, Putterman Logan, LLP, San Francisco, California for appellant.

Lori Swanson, Attorney General, Eric J. Maloney, Assistant Attorney General, Saint Paul, Minnesota, for amicus curiae State of Minnesota, by its Attorney General.

Jenneane Jensen, Kris Palmer, Jensen & Palmer, LLC, Minneapolis, Minnesota and;

Andrew J. Pincus, Archis A. Parasharami, Mayer Brown LLP, Washington, D.C., for amici curiae the Chamber of Commerce of the United States of America and the Minnesota Chamber of Commerce.

S Y L L A B U S

Appellant's electronic communications and web-based advertising sufficiently targeted Minnesota and established contacts with Minnesota to make it reasonable and consistent with notions of fair play and substantial justice to exercise specific personal jurisdiction over appellant.  The district court, therefore, did not err by denying appellant's motion to dismiss for lack of personal jurisdiction.

Affirmed.

O P I N I O N

ANDERSON, Justice.

This case raises the question of what contacts a defendant must have with Minnesota before our courts can exercise specific personal jurisdiction over that defendant.  Appellant MoneyMutual, LLC, claims that the district court erred when it concluded that it could exercise specific personal jurisdiction over MoneyMutual based on MoneyMutual's email correspondence with Minnesota residents and advertising in Minnesota.  The court of appeals affirmed the district court's decision, concluding that specific personal jurisdiction existed.  We granted MoneyMutual's petition for review and now affirm the court of appeals.

I.

MoneyMutual operates a website that allows individuals to apply for short-term loans, commonly known as "payday loans."  After an individual submits a loan application through MoneyMutual's website, MoneyMutual "matches" the applicant with

a payday lender in its network. For each matched applicant, MoneyMutual receives a "lead" fee from the lender. Respondents are four Minnesota residents who used MoneyMutual's website to obtain payday loans.

Respondents filed a class-action complaint, alleging that MoneyMutual matched respondents with payday lenders that were unlicensed in Minnesota. The complaint also alleged that the terms of the payday loans respondents received were illegal under Minnesota's payday-lending statutes because, among other claims, the annual percentage rates (APRs) advertised by MoneyMutual—which ranged "between 261% and 1304% for a 14 day loan"—exceeded the maximum allowable APRs under Minnesota law.[1] Respondents also claimed that MoneyMutual's website and advertising contained misrepresentations that violated Minnesota's consumer protection statutes, Minn. Stat. §§ 325D.44, 325F.67, 325F.69, (2014).[2] Finally, the complaint alleged that MoneyMutual unjustly enriched itself; that MoneyMutual participated in a civil conspiracy; and that MoneyMutual aided and abetted unlicensed lenders in making illegal loans to Minnesota residents.

---

[1] Respondents' complaint cites Minn. Stat. §§ 47.60, subd. 2, 47.601, subd. 2(a)(3)(ii) (2014), for these propositions.

[2] For example, respondents alleged that MoneyMutual's website falsely represents to potential borrowers that "MoneyMutual carefully chooses its network of lenders and requires each of them to follow a strict code of conduct, including abiding by all applicable state and federal laws."

MoneyMutual moved to dismiss the complaint for lack of personal jurisdiction.[3] *See* Minn. R. Civ. P. 12.02(f). In response to this motion, respondents submitted affidavits and exhibits alleging three categories of contacts connecting MoneyMutual with Minnesota.[4] First, respondents alleged that MoneyMutual sent several emails to Minnesota residents in connection with generating business. For instance, respondents alleged that MoneyMutual emailed loan applicants once it had "matched" the applicant with a particular payday lender. Significantly, respondents note that these emails were sent *after* the applicant had supplied MoneyMutual with valid physical address information as part of the application process. Additionally, respondents alleged that MoneyMutual sent emails to applicants who started but did not finish their online application. These emails urged the applicant to complete the application in order to be

---

[3] MoneyMutual also moved to dismiss the complaint for failure to join certain payday lenders as indispensable parties. *See* Minn. R. Civ. P. 12.02(f), 19.01. The district court denied this motion and the court of appeals affirmed. MoneyMutual did not raise this issue in its petition for review or in its brief to our court; thus, the issue is not before us.

[4] Although several affidavits were submitted by the parties and considered by the district court, the motion at issue here remained a motion to dismiss and was not converted to a motion for summary judgment. This is because the motion sought dismissal due to lack of jurisdiction, not failure to state a claim. *See* Minn. R. Civ. P. 12.02 ("If, on a motion asserting the defense that the *pleading fails to state a claim upon which relief can be granted*, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment . . . ." (emphasis added)); *see Marquette Nat'l Bank of Minneapolis v. Norris*, 270 N.W.2d 290, 292 (Minn. 1978) ("For purposes of a Rule 12.02, Rules of Civil Procedure, pretrial motion to dismiss for lack of personal jurisdiction, the factual allegations in the complaint and supporting affidavits are to be taken as true.").

matched with a payday lender. Finally, respondents alleged that MoneyMutual sent emails to prior loan applicants inviting them to apply for additional loans.

Second, respondents alleged that MoneyMutual bought television advertisements that appeared in Minnesota. Respondents submitted several affidavits from class members who claimed to have seen advertisements featuring a celebrity, Montel Williams, promoting the MoneyMutual website. MoneyMutual denies that it ever placed television advertising on local Minnesota broadcasts. According to MoneyMutual, its television advertising campaigns are purely national in scope. Respondents were unable to recall the specific broadcasts or channels featuring the MoneyMutual television advertisements.

Third, respondents alleged that MoneyMutual established contacts with Minnesota through its online advertising. Specifically, respondents claimed that MoneyMutual targeted Minnesota residents through a Google AdWords campaign. Respondents submitted an affidavit purporting to show that MoneyMutual purchased online ads that would appear when an individual searched Google for the terms "payday loan Minnesota" and "payday loan Minneapolis."[5] At no point during the present litigation

---

[5] Respondents submitted an affidavit from a law clerk employed by one of the law firms representing respondents. The affiant claimed experience with website marketing and Google AdWords and alleged that upon initiating a search Google with the phrase "payday loan Minnesota" and "payday loan Minneapolis," the MoneyMutual website appears in the "Ads" column. Clicking the information symbol and the "Ad Settings" link next to MoneyMutual's ads produced separate pages that explained: "This ad matches the *exact search* you entered: 'payday loans Minnesota' "; and "This ad matches the *exact search* you entered: 'payday loans Minneapolis.' " The "Ad Settings" page is an explanation of how Google matched the search terms to the ads that appeared. Respondents allege that the Google AdWords service "allows advertisers to use 'keyword

has MoneyMutual denied using Google AdWords to present its online advertisements when a user searched for "payday loan Minnesota" or "payday loan Minneapolis." But MoneyMutual did note that none of the respondents or class members indicated that they actually came into contact with MoneyMutual's website as a result of a Google search or one of MoneyMutual's AdWords advertisements.

After considering all of the affidavits and the arguments of the parties, the district court denied MoneyMutual's motion to dismiss. MoneyMutual appealed, and the court of appeals affirmed the decision of the district court. *See Rilley v. MoneyMutual LLC*, 863 N.W.2d 789 (Minn. App. 2015). We granted MoneyMutual's petition for review on the issue of personal jurisdiction.

## II.

"Whether personal jurisdiction exists is a question of law, which we review de novo." *Juelich v. Yamazaki Mazak Optonics Corp.*, 682 N.W.2d 565, 569 (Minn. 2004). When reviewing a motion to dismiss for lack of personal jurisdiction, we determine whether, taking all the factual allegations in the complaint and supporting affidavits as

matching options' to control which searches trigger their ads," which include an "exact match" option. With the "exact match" option, an advertisement will "appear only when someone searches for your exact keyword," or "close variations," including "misspellings, singular and plural forms, acronyms, stemmings . . . abbreviations, and accents." Based on these searches and the Ad Settings page, and other test searches "to rule out alternative explanations," the affidavit alleges that "it appears that MoneyMutual, or a person or entity acting on its behalf, is specifically paying to advertise for the terms 'payday loans Minnesota' and 'payday loans Minneapolis,' or close variations of those terms. Based on [the law clerk's] experience with PPC [pay-per-click] advertising and website marketing, [the affiant] can think of no other plausible explanation for why Google's Ads Settings for MoneyMutual's ads read, 'This ad matches the exact search you entered: 'payday loans Minnesota' or 'This ad matches the exact search you entered: 'payday loans Minneapolis.' ' "

6

true, the plaintiff has made a prima facie showing of personal jurisdiction. *Marquette Nat'l Bank v. Norris*, 270 N.W.2d 290, 292 (Minn. 1978); *Hardrives, Inc. v. City of LaCrosse*, 307 Minn. 290, 293, 240 N.W.2d 814, 816 (1976).

Minnesota's long-arm statute, Minn. Stat. § 543.19 (2014), provides that personal jurisdiction shall not be found over a nonresident defendant if it would "violate fairness and substantial justice." We have held that Minnesota's long-arm statute "extend[s] the personal jurisdiction of Minnesota courts as far as the Due Process Clause of the federal constitution allows." *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410 (Minn. 1992). Therefore, "when analyzing most personal jurisdiction questions, Minnesota courts may simply apply the federal case law."[6] *Id.* at 411.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution prohibits a state court from exercising personal jurisdiction over a nonresident defendant unless that defendant has "minimum contacts" with the state and maintaining the lawsuit "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). "Minimum contacts" exist when the defendant "purposefully avails itself" of the privileges, benefits, and protections of the forum state, such that the defendant "should reasonably anticipate being haled into court there." *Burger King*

---

[6]    MoneyMutual has framed its arguments entirely in terms of Due Process Clause jurisprudence and thus it is unnecessary to address the specific text of the Minnesota long-arm statute.

*Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

The "minimum contacts" necessary to support specific[7] personal jurisdiction over the defendant must focus on "the relationship among the defendant, the forum, and the litigation," and the "defendant's suit-related conduct must create a substantial connection with the forum state," *Walden v. Fiore*, ___ U.S. ___, 134 S. Ct. 1115, 1121 (2014) (internal quotation marks omitted), such that the litigation results from alleged harms that "arise out of or relate to" the defendant's contacts with the forum, *Burger King*, 471 U.S. at 472. This minimum-contacts inquiry must "look[] to the defendant's contacts with the forum State itself" and not the defendant's " 'random, fortuitous, or attenuated' contacts" with "persons affiliated with the State" or "persons who reside there." *Walden*, ___ U.S. at ___, 134 S. Ct. at 1122-23 (quoting *Burger King*, 471 U.S. at 480). But in some cases, "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties." *Id.* at ___, 134 S. Ct. at 1123.

Although physical presence by the defendant in the forum state is not required for specific personal jurisdiction, minimum contacts may exist when an out-of-state defendant "purposefully direct[s]" activities at the forum state, and the litigation "arises

---

[7] Respondents allege only specific personal jurisdiction applies here, which requires that the litigation "arise out of or relate to" the defendant's contacts with the forum state. *Burger King*, 471 U.S. at 472 & n.15 (quoting *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). By contrast, general personal jurisdiction may be exercised based on contacts unrelated to the litigation, e.g., domicile or "continuous and systematic" contacts with the forum state. *Daimler AG v. Bauman*, ___ U.S. ___, 134 S. Ct. 746, 754 (2014); *see also Walden v. Fiore*, ___ U.S. ___, 134 S. Ct. 1115, 1121, n.6 (2014).

out of or relate[s] to" those activities. *Burger King*, 471 U.S. at 472; *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1432-34 (8th Cir. 1995); *Real Props., Inc. v. Mission Ins. Co.*, 427 N.W.2d 665, 668 (Minn. 1988). The United States Supreme Court has recognized that "a substantial amount of business is transacted solely by mail and wire communications across state lines." *Burger King*, 471 U.S. at 476. As a result, the Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction" when "a commercial actor's efforts are 'purposefully directed' toward residents of another State." *Id.*

If minimum contacts are established, we must consider the "reasonableness" of personal jurisdiction according to traditional notions of "fair play and substantial justice," weighing factors such as the convenience of the parties and the interests of the forum state. *See id.* at 476-77 (citing *World-Wide Volkswagen Corp.*, 444 U.S. at 292). We analyze five factors to determine whether the exercise of personal jurisdiction is consistent with federal due process: "(1) the quantity of contacts with the forum state; (2) the nature and quality of those contacts; (3) the connection of the cause of action with these contacts; (4) the interest of the state providing a forum; and (5) the convenience of the parties." *Juelich*, 682 N.W.2d at 570. This five-factor test is simply a means for evaluating the same key principles of personal jurisdiction established by the United States Supreme Court—namely, whether exercising jurisdiction over a defendant is consistent with "traditional concepts of fair play and substantial justice." *See K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592 (8th Cir. 2011) (quoting *Burger*

9

*King*, 471 U.S. at 464); *Dent-Air, Inc. v. Beech Mountain Air Serv., Inc.*, 332 N.W.2d 904, 907 (Minn. 1983).

"The first three factors [of this test] determine whether minimum contacts exist and the last two factors determine whether jurisdiction is reasonable according to traditional notions of fair play and substantial justice." *Juelich*, 682 N.W.2d at 570-71. Although the key inquiry is whether minimum contacts have been established, a strong showing on the reasonableness factors may "serve to fortify a borderline showing" of minimum-contacts factors. *Id.* at 570-51 (quoting *Ticketmaster-N. Y., Inc. v. Alioto*, 26 F.3d 201, 210 (1st Cir. 1994)); *see Burger King*, 471 U.S. at 477 ("These [reasonableness] considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.").

### III.

In light of the test for establishing specific personal jurisdiction, we now evaluate whether MoneyMutual has the necessary minimum contacts with Minnesota to support a finding of personal jurisdiction. Respondents argue that MoneyMutual has three categories of contacts with Minnesota: (1) emails sent to Minnesota residents, (2) television advertisements that appeared in Minnesota, and (3) Google AdWords advertisements that targeted the Minnesota market. We address each in turn.

### A.

Respondents assert that MoneyMutual made contact with more than 1,000 Minnesotans via email. Specifically, respondents identify three types of emails that

10

MoneyMutual sent to known Minnesota residents. First, after an applicant completed the online application process on MoneyMutual's website, MoneyMutual sent the applicant an email "matching" the applicant with a payday lender in MoneyMutual's network. Second, MoneyMutual sent emails to encourage applicants to complete an unfinished loan application. Finally, MoneyMutual sent emails soliciting prior loan applicants to apply for additional loans.

MoneyMutual argues that these email contacts are irrelevant to the minimum contacts analysis. To support this argument, MoneyMutual and its amici rely heavily on the United States Supreme Court's decision in *Walden* to argue that its interactions with known Minnesota *residents* are per se insufficient to establish minimum contacts with a Minnesota *forum*. But *Walden*'s holding is not as broad as MoneyMutual contends, and its facts are easily distinguishable. *Walden* merely held that a defendant's "random, fortuitous, or attenuated" contact with a forum resident in an airport—while the resident was outside of the forum—was insufficient to support personal jurisdiction. ___ U.S. at ___, 134 S. Ct. at 1122-23 (quoting *Burger King*, 471 U.S. at 480); *see MRL Dev. LLC v. Whitecap Inv. Corp.*, Civil No. 2013-48, 2014 WL 5441552, at *4 (D.V.I. Oct. 26, 2014) (rejecting an overly broad reading of *Walden* and stating that "*Walden* stands for the proposition that a defendant's contact with a resident of the forum state, outside of the forum state, is insufficient to establish minimum contacts with the forum state"). *Walden* does not disturb numerous, long-established precedents allowing courts to exercise personal jurisdiction over defendants based in part on commercial contacts with businesses or residents that are located inside the forum. *See, e.g.*, *Burger King*, 471 U.S.

11

at 472-77; *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957); *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 647-48 (1950).

Indeed, even *Walden* explained that in some cases "a defendant's contacts with the forum State may be *intertwined* with his transactions or interactions with the plaintiff." ____ U.S. at ___, 134 S. Ct. at 1123 (emphasis added). Here, MoneyMutual's commercial solicitations of over 1,000 loan applicants with known Minnesota addresses were not "random, fortuitous, or attenuated" contacts with forum residents, but rather constitute "intertwined" contacts with both Minnesota residents and the state of Minnesota.

MoneyMutual next argues that the emails are not relevant to the jurisdictional analysis because long-distance communications between a plaintiff and defendant—and particularly email communications—cannot establish personal jurisdiction. But in *Marquette National Bank* we clearly stated: "The fact that the nonresident appellants were never physically present in the state in the course of their transaction, which was accomplished entirely by telephone and mail, is clearly of no significant consequence." 270 N.W.2d at 295.

The United States Supreme Court also has recognized that "a substantial amount of business is transacted solely by mail and wire communications across state lines." *Burger King*, 471 U.S. at 476. And the Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction" when "a commercial actor's efforts are 'purposefully directed' toward residents of another State." *Id*. In this case, Minnesota residents provided MoneyMutual with their personal information and, in

12

return, MoneyMutual matched those residents with potential lenders. That these transactions[8] were accomplished over long distance "is clearly of no significant consequence." *See Marquette Nat'l Bank of Minneapolis*, 270 N.W.2d at 295.

Nonetheless, MoneyMutual argues that these contacts should be disregarded because they occurred via email. Historically, courts have been willing to find minimum contacts based in part on communications by out-of-state defendants with forum residents, such as phone calls, faxes, and letters. *See, e.g.*, *Grand Entm't Grp. v. Star Media Sales, Inc.*, 988 F.2d 476, 482 (3d Cir. 1993) ("Mail and telephone communications sent by the defendant into the forum may count toward the minimum contacts that support jurisdiction."); *Marquette Nat'l Bank of Minneapolis*, 270 N.W.2d at 295. But the proliferation of email has created additional questions regarding the role that electronic long-distance communications should play in establishing personal jurisdiction.

---

[8] MoneyMutual argues that it never engaged in any "transactions" with Minnesota residents and asserts that the court of appeals was mistaken when it characterized the events in question as three-sided transactions between borrowers, lenders, and MoneyMutual. *See Rilley v. MoneyMutual, LLC*, 863 N.W.2d 789, 794 (Minn. App. 2015) ("The interaction between the respondents, MoneyMutual, and the lenders is better described as a three-sided transaction with each party taking action before the loan is made, rather than a series of unilateral acts by the respondents."). But even if MoneyMutual were correct and the court of appeals incorrectly characterized MoneyMutual's relationship with lenders and borrowers, MoneyMutual itself still engaged in transactions with Minnesota residents. The mere fact that MoneyMutual never extended a loan or that respondents in this case never paid MoneyMutual does not refute the existence of a transaction. Respondents clearly provided their personal information to MoneyMutual and, in return for that information, MoneyMutual matched respondents with various lenders in MoneyMutual's network. Although there was no monetary consideration, this exchange of information still constitutes a transaction. And, significantly, the emails sent by MoneyMutual to Minnesota residents matching them with a lender represent the culmination of that transaction.

The primary problem with relying on emails to establish personal jurisdiction is that, unlike a letter, the sender of an email may not know the geographic destination of the message. *See, e.g.*, *Shrader v. Biddinger*, 633 F.3d 1235, 1247-48 (10th Cir. 2011) ("Although email is directed to particular recipients, email addresses typically do not reveal anything about the geographic location of the addressee."); *Rice v. Karsch*, 154 F. App'x 454, 462 (6th Cir. 2005) ("There is nothing about this email address which indicates that Rice would have accessed his yahoo.com email account or otherwise read this email in Tennessee."); *Watiti v. Walden Univ.*, No. 07-4782, 2008 WL 2280932, at *10 (D.N.J. May 30, 2008) ("Unlike a 'snail mail' address (i.e., U.S. Mail) or even a telephone number, there is usually nothing about an email address that would indicate to the sender the location of the recipient."). This reality is particularly troublesome because the personal-jurisdiction inquiry must focus on the defendant's contacts with the forum and not merely "random, fortuitous, or attenuated" connections with residents of a forum. *Walden*, ___ U.S. at ___, 134 S. Ct. at 1123 (quoting *Burger King*, 471 U.S. at 480); *see Aaron Ferer & Sons Co. v. Atlas Scrap Iron & Metal Co.*, 558 F.2d 450, 455 n.6 (8th Cir. 1977); *W. Am. Ins. Co. v. Westin, Inc.*, 337 N.W.2d 676, 678-79 (Minn. 1983). If the sender of an email does not know the physical location of the recipient, the fact that the recipient happens to be located in a particular state is the definition of a "random, fortuitous, or attenuated" connection.

As a result of these challenges, three approaches to email-based contacts have developed in federal courts. First, for the above reasons, some courts reject *any*

consideration of email-based contacts.[9]  Under a second approach, courts hold that email communications *alone* are insufficient but that emails are "secondary" contacts that can be *added* to other types of contacts to *support* personal jurisdiction.[10]  Finally, under a third approach, courts suggest that email-based contacts may establish personal jurisdiction, provided that the context of the email, or other relevant evidence, indicates that the sender knew or had reason to know that the recipient was located, and would receive the email within, a certain forum—or more generally, the plaintiff makes a prima facie showing that the sender "purposefully directed" the email at the forum.[11]

---

[9]     *See, e.g.*, *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 803 (7th Cir. 2014) ("The fact that [the defendant] . . . shower[ed] past customers and other subscribers with company-related emails does not show a relation between the company and Indiana. . . . [E]mail . . . bounces from one server to another . . . it winds up wherever the recipient happens to be at that instant.  The connection between the place where an email is opened and a lawsuit is entirely fortuitous."); *KG Funding, Inc. v. Partridge*, No. 12-2155, 2012 WL 5904439, at *2 (D. Minn. Nov. 26, 2012) ("[T]he [email] receivers' location alone should not determine specific jurisdiction. Partridge purposefully communicated with a resident who lived in Minnesota, but there is no evidence that Partridge purposefully availed himself of the Minnesota legal forum."); *Hearst Corp. v. Goldberger*, No. 96 CIV. 3620, 1997 WL 97097, at *12 (S.D.N.Y. Feb. 26, 1997) (holding that "e-mails are analogous to letters to or telephone communications with people in New York," which "are not sufficient to establish personal jurisdiction").

[10]    *See, e.g.*, *Yellow Brick Rd., LLC v. Childs*, 36 F. Supp. 3d 855, 872 (D. Minn. 2014) ("[E]mail/telephone/fax communications may only be used to *support* the exercise of personal jurisdiction—'they do not themselves establish jurisdiction.' " (quoting *Digi–Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd.*, 89 F.3d 519, 523 (8th Cir. 1996)); *Nicollet Cattle Co. v. United Food Grp., LLC*, No. 08-5899, 2009 WL 2218792, at *4 (D. Minn. July 23, 2009) ("[M]ail and telephone contacts—and presumably email contacts as well—'remain a consideration in determining whether the defendant purposefully availed [it]self of the privilege of doing business in Minnesota.' " (quoting *Wessels*, 65 F.3d at 1433)).

[11]    *See Watiti*, 2008 WL 2280932, at *10-11 ("Email correspondence . . . will not trigger personal jurisdiction unless the communications show such 'purposeful

15

Having considered the body of persuasive authority on this point, we conclude that the third approach, which considers emails just like any other contact with the forum, is the appropriate rule of law. In the modern digital era, with ubiquitous e-commerce and electronic communication, it would be arbitrary to exclude emails from consideration in a minimum contacts analysis, or to limit email to an exclusively supplemental role.

The most reasonable approach is to simply apply the traditional minimum contacts analysis by considering the quantity, nature, and quality of the email contacts, and whether those contacts establish a "substantial connection" between the defendant, the forum, and the litigation, such that the defendant "purposefully availed" himself of the forum and "reasonably anticipate[d] being haled into court" there. *Walden*, ___ U.S. at ___, 134 S. Ct. at 1121 (quoting *World-Wide Volkswagen*, 444 U.S. at 297); *Burger King*, 471 U.S. at 472-74; *Wessels*, 65 F.3d at 1432. The unique characteristics of email as a form of communication necessarily require a district court to consider whether the

availment' . . . . [The] threshold question [regarding purposeful availment] . . . is whether there is any indication in the substance of the emails, the email address itself, or other facts incident to the communications that the sender of the emails was aware that the recipient was located in or would be accessing the emails from the forum state."); *see, e.g.*, *Am. Bd. of Internal Med. v. Rushford*, No. 14-6428, 2015 WL 5164791, at *5 (D.N.J. Sept. 2, 2015) ("Before he sent his first email to Arora, Salas Rushford knew that the company was based in New Jersey"); *Valley Nat'l Bank v. Corona-Norco Unified Sch. Dist.*, No. 15-CV-0282, 2015 WL 5023252, at *5 (N.D. Okla. Aug. 24, 2015) ("[D]efendant's e-mails . . . do evidence reaching out to Oklahoma because his signature block, which would have been visible following his first communication, clearly demonstrates his presence in Oklahoma."); *Doe v. Hofstetter*, No. 11-CV-02209, 2012 WL 2319052, at *5 (D. Colo. June 13, 2012) ("The emails demonstrate that Defendant purposefully directed tortious activity at Colorado—as long as Defendant knew that John Doe was located in this state."); *see also Shrader*, 633 F.3d at 1248 ("[I]f the plaintiff does not show that the defendant otherwise knew where the recipient was located, the email itself does not demonstrate purposeful direction of the message to the forum state . . . .").

defendant was aware of the plaintiff's location or at least had reason to believe that the email would be received in a particular jurisdiction.

Here, MoneyMutual's solicitation of and transactions with over 1,000 Minnesotan loan applicants via email demonstrates a "purposeful direction" of litigation-related conduct at Minnesota. Significantly, when MoneyMutual sent emails matching applicants to lenders in its network, those applicants had already completed an online application that showed they were Minnesota residents. Thus, MoneyMutual clearly knew or should have known that emails to these applicants likely would be opened in Minnesota.[12] Similarly, when MoneyMutual sent follow-up emails encouraging prior applicants to seek additional loans, MoneyMutual had sufficient information to know that the applicants were Minnesota residents and that the emails likely were to be opened in Minnesota.[13]

---

[12]   It is no excuse that MoneyMutual's website and email-solicitation systems are automated and depend solely on unilateral activity by users, because MoneyMutual or others under its direction programmed these systems. *See uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 428 (7th Cir. 2010) ("No more persuasive is GoDaddy's argument that its sales to Illinois residents are automated transactions unilaterally initiated by those residents. GoDaddy tells us that its customers enter into most transactions without any human action on GoDaddy's end. But of course the customers . . . are not simply typing their credit card numbers into a web form and hoping they get something in return. GoDaddy itself set the system up this way. It cannot now point to its hundreds of thousands of customers in Illinois and tell us, 'It was all their idea.' "); *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 758 (7th Cir. 2010) ("Characterizing the sales [from Hemi's website] as unilateral is misleading, however, because it ignores several of Hemi's own actions that led up to and followed the sales. Hemi created several commercial, interactive websites through which customers could purchase cigarettes from Hemi.").

[13]   The record is admittedly less clear regarding emails sent reminding applicants to finish a partially completed application form. To begin with, as MoneyMutual argues, the only evidence of these "unfinished application" emails comes from a private

Despite the electronic, email-based nature of these relationships, these contacts demonstrate "purposeful direction" toward Minnesota and a "purposeful availment" of the benefits of doing business in a Minnesota forum—namely, a profitable pool of low-income Minnesota residents that MoneyMutual could match with its payday-lending network to generate lead fees. In other words, MoneyMutual availed itself of a Minnesota forum because it profited by selling lead information to payday lenders about Minnesota residents. These facts, demonstrating a "purposeful availment" of the Minnesota forum, should have caused MoneyMutual to reasonably anticipate being haled into court in Minnesota. Thus, MoneyMutual's emails to respondents are contacts with Minnesota that support the exercise of personal jurisdiction.

B.

Respondents next allege that MoneyMutual had contact with Minnesota through television advertisements. Respondents submitted affidavits alleging that they saw advertisements for MoneyMutual's website on television while in their homes in Minnesota. MoneyMutual has argued that its television advertisement campaign was "purely national in scope" and specifically denies that it placed television advertisements with any "Minnesota-based . . . television stations." MoneyMutual also has averred that

---

investigator who received the emails after he was hired by respondents' counsel to test MoneyMutual's website. Indeed, no respondents alleged that they received "unfinished application" emails. Additionally, that the loan application was incomplete at the time these emails were sent raises questions regarding whether MoneyMutual was aware of the applicant's state of residence at the time the emails were sent. Because the record provides no clear answers to these questions, we decline to consider the "unfinished application" emails as part of our minimum contacts analysis.

18

"[n]o advertising of any kind is targeted specifically to Minnesota or Minnesotans. Nor is any advertising content targeted specifically at Minnesota or Minnesotans."

Relying on its decision in *Humphrey v. Granite Gate Resorts, Inc.*, 568 N.W.2d 715, 719-20 (Minn. App. 1997), *aff'd*, 576 N.W.2d 747 (Minn. 1998), the court of appeals held that, even with its national scope, MoneyMutual's television campaign supported personal jurisdiction in Minnesota. The court of appeals essentially concluded that, because Minnesota was included within the national scope of MoneyMutual's advertising, MoneyMutual had "targeted" Minnesota and, therefore, the television advertisements were relevant contacts for establishing personal jurisdiction in Minnesota. *Rilley*, 863 N.W.2d at 795.

Whether a national advertising campaign is a relevant contact for the purpose of establishing specific personal jurisdiction is a question of first impression in our court. Some courts have relied in part on purely national advertising to establish minimum contacts in support of personal jurisdiction.[14] But numerous other courts—perhaps a

---

[14] *See, e.g.*, *uBID, Inc.*, 623 F.3d at 428 (disagreeing with the defendant's argument that "[a]lthough its ads can be seen on Illinois television sets . . . these are only parts of a national advertising campaign and [the defendant] does not target . . . Illinois residents in particular," because it was "easy to infer" that GoDaddy "intended to reach as large an audience as possible, including [Illinois]" and because the national marketing campaign "created substantial business" for the defendant in Illinois); *Morris v. SSE, Inc.*, 843 F.2d 489, 494 (11th Cir. 1988) (holding that minimum contacts were established in part by "a reasonable inference that SSE advertised in Alabama" because "[i]t is undisputed that SSE advertised in national trade magazines"; "such advertisements were a major source of business for SSE"; and "SSE presented no evidence and did not argue that the magazines were not sold or did not appear in Alabama during this period"); *Henderson v. Laser Spine Inst.*, 815 F. Supp. 2d 353, 377 (D. Me. 2011) (holding that minimum contacts with Maine supported personal jurisdiction based in part on "significant national sales" and "extensive national advertising" in magazines and catalogs, which was

19

majority—have rejected purely national advertising as a contact supporting personal jurisdiction because such activity is not purposefully directed at the forum state.[15]

Most significantly, relying on purely national marketing activity to support minimum contacts appears to be in tension with the United States Supreme Court's holding in *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011) (plurality

"intended to reach a large national audience, including potential customers in Maine"); *Rostad v. On-Deck, Inc.*, 372 N.W.2d 717, 721 (Minn. 1985) ("On-Deck's distribution contracts and marketing efforts were calculated attempts to create a national market for his product, a market which specifically includes Minnesota.").

[15]     *See, e.g.*, *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1305 (10th Cir. 1994) ("[M]ere placement of advertisements in nationally distributed papers or journals does not rise to the level of purposeful contact with a forum required . . . to exercise personal jurisdiction."); *Wines v. Lake Havasu Boat Mfg., Inc.*, 846 F.2d 40, 43 (8th Cir. 1988) ("The sole contact between Lake Havasu, this lawsuit, and Minnesota is Lake Havasu's advertising of its product in a nationally distributed trade publication which is circulated in Minnesota.  It does not appear . . . that Lake Havasu's advertising represents a purposeful availment of the benefits and protections of Minnesota law."); *Scheidt v. Young*, 389 F.2d 58, 60 (3d Cir. 1968) (holding that "advertisements in an out of state newspaper circulated in [the forum state], . . . [is a] peripheral occurrence[] and do[es] not constitute some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State" (internal quotation marks omitted)); *Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 421 (S.D.N.Y. 2009) (holding that defendant's "selling [of] advertisements on its website to national advertisers" was insufficient to confer personal jurisdiction because there was insufficient evidence of any "purposeful attempt to take advantage of the New York market"); *Seitz v. Envirotech Sys. Worldwide Inc.*, 513 F. Supp. 2d 855, 864 (S.D. Tex. 2007) ("[N]ational advertising that may include circulation in the forum state is generally insufficient to show jurisdiction over a nonresident defendant in that state."); *Decker v. Circus Circus Hotel*, 49 F. Supp. 2d 743, 748-49 (D.N.J. 1999) (holding that "television advertisement[s] . . . on a national cable network"; "advertisements in national magazines and newspapers"; and the "mailing of [information] to former guests in New Jersey and New Jersey citizens who directly request information," without more, were "not enough to establish minimum contacts to the forum state" because "the record does not reflect that the defendant ever specifically targeted New Jersey for its advertisements"); *Polaroid Corp. v. Feely*, 889 F. Supp. 21, 27 (D. Mass. 1995) ("[N]ational advertisements not aimed specifically at Massachusetts residents cannot subject a defendant to jurisdiction in this state . . . .").

20

opinion) (holding that national "marketing and sales efforts" did not support personal jurisdiction; although it " may reveal an intent to serve the U.S. market," "it is petitioner's purposeful contacts with New Jersey, not with the United States, that alone are relevant"). *Nicastro* may be distinguishable here because the "marketing efforts" in that case consisted solely of attending several national trade shows outside of New Jersey, rather than advertising content that actually appeared in the forum state. *Id.* Ultimately, however, *Nicastro* provides a guiding principle that efforts to target the national market of the United States do not equate to contacts with a particular state simply because that state is a part of the national market. *Id.*

In light of this principle, we hold that a purely national advertising campaign that does not target Minnesota specifically cannot support a finding of personal jurisdiction. To the extent that *Humphrey v. Granite Gate Resorts, Inc.*, 568 N.W.2d 715 (Minn. App. 1997), *aff'd*, 576 N.W.2d 747 (Minn. 1998), is inconsistent with this holding, it is overruled.

Because MoneyMutual denied engaging in any television advertising that was specific to or targeted the Minnesota market, and supported this denial with an affidavit, respondents cannot rely on general statements for a prima facie showing of personal jurisdiction—rather, specific evidence must be alleged. *Hoff v. Kempton*, 317 N.W.2d 361, 363 n.2 (Minn. 1982) ("[I]f [the defendant's] motion to dismiss is supported by affidavits, the nonmoving party cannot rely on general statements in his pleading."). Here, there is no evidence that MoneyMutual's television advertisements were directed at

21

or tailored for any Minnesota markets.[16]  Respondents did not allege on which specific programs these advertisements appeared and provide no other evidence that indicates that MoneyMutual's television advertising campaign specifically targeted Minnesota.  As a result, MoneyMutual's television advertisements are not relevant contacts for the purpose of our minimum contacts analysis.

## C.

Finally, respondents argue that MoneyMutual targeted the Minnesota market and established contacts with Minnesota through its Google AdWords advertising campaign. Respondents submitted an affidavit indicating that MoneyMutual had purchased advertisements that appeared when a Google user searched for "payday loans Minnesota" or "payday loans Minneapolis."  According to respondents, Google's "Ad Settings" page indicated that MoneyMutual's ads matched the *exact search* that the user had entered—in other words, MoneyMutual paid to display those ads to customers who specifically searched for "payday loans Minnesota" or "payday loans Minneapolis."  Respondents

---

[16]     One respondent alleged that, when he saw MoneyMutual's television ads, he "did not have cable TV at the time, and saw the advertisements on either a network or local station."  But this averment is still insufficient to establish that the television ads were targeted at Minnesota.  According to MoneyMutual, their "purely national" advertising was distributed on national cable programs or nationally syndicated network programs. The respondent's affidavit stated that he saw the ads on "*either* a network or local station."  Thus, MoneyMutual's ads may have appeared on a nationally syndicated program, rather than a local broadcast.  In light of MoneyMutual's affidavit, and because respondents do not provide evidence of the specific channels, networks, or programs on which the ads appeared, there is no prima facie showing that MoneyMutual targeted Minnesota with its television ads.

argue that these advertising purchases show an intent on MoneyMutual's part to target the Minnesota market.

Throughout the proceedings, MoneyMutual has never specifically denied using the Google AdWords service or paying for the use of the exact keywords "payday loans Minnesota" and "payday loans Minneapolis."[17] Instead, MoneyMutual makes several legal arguments. First, MoneyMutual argued, in a reply brief on the motion to dismiss, that the affidavit submitted by respondents "proves nothing" and "does not show MoneyMutual specifically targeted Minnesota" because the affidavit does not prove that "*only* Minnesota" was the target of a Google AdWords campaign. MoneyMutual reiterated the same argument at the motion hearing, stating that "nowhere does the affiant . . . say that, well, she checked to see if exactly the same thing happened when she tried other states and other locales. So it's not proof of anything."

This argument fails because it is not necessary to rule out the targeting of other forums, in addition to Minnesota, in order to establish Minnesota's personal jurisdiction over a particular defendant. Hypothetically, if MoneyMutual paid for AdWords directed at other states, such as "payday loan New York," it would not diminish the conclusion that MoneyMutual targeted Minnesota with its AdWords campaign. Rather, it would tend to establish contacts with *both* Minnesota and New York. In the absence of any evidence to the contrary, we must accept as true respondents' prima facie allegations

_____

[17] MoneyMutual generally affirms that "[n]o advertising of any kind is targeted specifically to Minnesota or Minnesotans." This general denial is troubling in light of the allegations in respondents' affidavits and exhibits regarding the Google AdWords campaign.

23

related to these Google Ads, including that there is no "plausible explanation" for MoneyMutual's ads to appear as an "exact match" for "payday loan Minnesota" other than MoneyMutual "specifically paying to advertise" those exact keywords. Certainly MoneyMutual has not offered any plausible explanation for the exact match. Nor has MoneyMutual specifically denied the existence of such an exact match.

Second, MoneyMutual argues that the Google AdWords allegation is "irrelevant, speculative, [and] lack[s] foundation." Specifically, MoneyMutual argues that the allegation lacks foundation and is speculative because the affiant was a "clerk employed by Respondents' law firm who speculate[d] as to how Google operates and what advertising MoneyMutual purchased." But the affidavit submitted by respondents is detailed and consists primarily of quotes and screenshots from Google's website that explain how Google AdWords, the Ad Settings page, and the "exact match" option functioned. MoneyMutual does not provide any evidence to contradict respondents' account and does not allege that the affidavit is somehow fraudulent or wrong. At this early stage of the litigation, we must take all of the allegations contained in the complaint and the supporting affidavits as true. *Hardrives, Inc.*, 307 Minn. at 293, 240 N.W.2d at 816. Respondents have provided a sufficient basis for considering the Google AdWords evidence.

Third, MoneyMutual argues that the Google AdWords allegation is "irrelevant because no Respondent alleges that they actually performed a Google search." This relevance argument presumably refers to the "connection" requirement for specific jurisdiction. *See Burger King*, 471 U.S. at 472-73 (requiring that the harm resulting in

24

litigation "arise out of or relate to" the defendant's contacts with the forum); *Wessels*, 65 F.3d at 1432-34. In other words, MoneyMutual argues that respondents have failed to provide evidence that a respondent or class member saw the Google Ad, clicked on it, and that it caused him or her to apply for a loan at the MoneyMutual website.

Courts disagree about how to apply this connection requirement (also referred to as the "relatedness" or "nexus" requirement) for specific personal jurisdiction. *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 912-13 (8th Cir. 2012) (describing the three major approaches: a strict "proximate cause" standard; a "but for" standard; and a more lenient "substantial connection" standard). In many courts, the connection requirement does not require proof that the litigation was strictly caused by or "[arose] out of" the defendant's contacts; rather, it is sufficient to show that the contacts are "substantially connected" or "related to" the litigation. For example, in *S.E.C. v. Carrillo*, 115 F.3d 1540, 1544 (11th Cir. 1997), the court rejected the defendant's argument that personal jurisdiction was lacking because the SEC failed to show that advertisements actually caused investors to purchase securities. That argument "misconstrue[d]" the relatedness prong, under which "the contacts must be *related* to the plaintiff's cause of action *or* have given rise to it." *Id.* at 1544. The relatedness prong was satisfied as "the advertisements were 'related to' the causes of action because the advertisements were a means by which [the defendant] offered and sought to sell its unregistered securities to potential American investors." *Id.* A number of other courts have adopted this reasoning.[18]

---

[18]     *See, e.g.*, *Myers*, 689 F.3d at 912-13 (rejecting the "proximate cause" approach and appearing to follow a more "flexible approach" to the relatedness inquiry);

25

Although at this early stage of the litigation there is no evidence that the Google Ads actually *caused* any of the claims, the Google Ads are sufficiently *related* to the claims of respondents to survive a motion to dismiss. Respondents allege that MoneyMutual's website and advertising violated consumer protection statutes on false advertising and deceptive trade practices and that MoneyMutual conspired with, aided, and abetted, unlicensed payday lenders that extended loans under terms that violated Minnesota law. MoneyMutual's Google Ads, which were targeted at searches including "Minnesota" and "Minneapolis," solicited viewers to apply for these allegedly illegal payday loans by stating, for example: "Apply Online Now www.moneymutual.com Fast Payday Loan - Apply Online! Safe & Bad Credit OK Up to $1,000."

As in the *Carrillo* case discussed above, these ads are sufficiently "related to" the cause of action because they were a means by which MoneyMutual solicited Minnesotans to apply for the allegedly illegal loans. *Carrillo*, 115 F.3d at 1544. As a result, MoneyMutual's use of Google AdWords advertising that was specifically designed to target Minnesota residents is a relevant contact with the Minnesota forum for the purpose of the minimum contacts analysis.

D.

Having reviewed the various categories of contacts that MoneyMutual had with Minnesota, we must determine whether sufficient minimum contacts exist to support the

---

*Ticketmaster-N. Y., Inc.*, 26 F.3d at 206 ("[W]e think it significant that the [two halves of the relatedness requirement are] disjunctive in nature, referring to suits 'aris[ing] out of, *or* relat[ing] to,' in-forum activities. We believe that this added language portends added flexibility and signals a relaxation of the applicable standard. A number of other courts share this belief." (citations omitted)).

existence of personal jurisdiction here. In determining whether a defendant has sufficient "minimum contacts," we consider the contacts alleged by the plaintiff in the aggregate and not individually, by looking at the totality of the circumstances." *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1388 (8th Cir. 1995). After a thorough review, we conclude that minimum contacts with Minnesota exist and support the exercise of personal jurisdiction in this case.

MoneyMutual sent over 1,000 emails to known Minnesotans, soliciting them to apply for payday loans. These emails were the culmination of transactions between MoneyMutual and Minnesota residents through which Minnesota residents provided their personal information to MoneyMutual in return for being matched with a payday lender. By engaging in these transactions and knowingly matching Minnesota residents with payday lenders, MoneyMutual purposefully availed itself of the Minnesota market and Minnesota forum and should have "reasonably anticipate[d] being haled into court" in Minnesota. *Burger King*, 471 U.S. at 474. These contacts alone are sufficient to support a finding of personal jurisdiction.

MoneyMutual also engaged with the Minnesota market through the use of Google AdWords, specifically designed and calibrated to target potential Minnesota customers. Unlike its national television advertising campaign, MoneyMutual's use of Google AdWords was specific to Minnesota and, once again, demonstrates that MoneyMutual purposefully directed its conduct toward Minnesota, further buttressing the conclusion that sufficient minimum contacts exist for the exercise of personal jurisdiction over MoneyMutual.

27

IV.

Finally, in light of our conclusion that sufficient minimum contacts exist, we must consider whether exercising personal jurisdiction over MoneyMutual in this case comports with "traditional notions of fair play and substantial justice." *Juelich*, 682 N.W.2d at 570 (citing *Int'l Shoe*, 326 U.S. at 316); *see Burger King*, 471 U.S. at 476-78. This "reasonableness" determination requires us to consider two factors: the interests of the forum state and the convenience of the parties. *Juelich*, 682 N.W.2d at 570.

Here, the reasonableness factors also point toward the exercise of personal jurisdiction over MoneyMutual. Minnesota has a strong interest in protecting its residents from predatory lending, enforcing consumer protection laws, and providing a forum for litigating violations of its payday-lending statutes. *See, e.g.*, *SoftBrands Mfg., Inc. v. Missing Link Consulting, Inc.*, No. Civ. 04-3900, 2004 WL 2944112, at *7 (D. Minn. Dec. 20, 2004) ("Minnesota has an interest in providing a forum for its citizens to . . . enforce consumer protection suits."); *Kopperud v. Agers*, 312 N.W.2d 443, 445 (Minn. 1981) ("Minnesota has an obvious interest in providing a forum since Minnesotans were defrauded."). In addition, Minnesota is a convenient forum for the respondents and class members, as they reside in Minnesota, their financial harm was suffered in Minnesota, and requiring them to travel outside of the state could exacerbate their difficult financial situation. MoneyMutual, on the other hand, does not present any arguments or evidence that litigating the class-action claims in Minnesota would be inconvenient (likely because it argues that convenience is not a relevant factor under Minnesota law).

28

## V.

In conclusion, MoneyMutual had sufficient minimum contacts with Minnesota to support the exercise of personal jurisdiction in this case. Additionally, subjecting MoneyMutual to suit in a Minnesota forum is reasonable and consistent with traditional notions of fair play and substantial justice. As a result, the district court did not err when it denied MoneyMutual's motion to dismiss for lack of personal jurisdiction. We remand this case for further proceedings consistent with this opinion.[19]

Affirmed.


LILLEHAUG, CHUTICH, JJ., took no part in the consideration or decision of this case.

---

[19] Although we conclude that there is a sufficient basis to assert personal jurisdiction in this case, we express no opinion as to the ultimate merit of respondents' claims.